Diane ANDREWS–CLARKE, Individually and as Next Friend of the Estate of Richard J. Clarke and Next Friend of Diane Clarke, a minor child, and Lacey Clarke, a minor child, and Carly Clarke, a minor child, and Justin Clarke, a minor child, Plaintiff,

v.

TRAVELERS INSURANCE COMPANY; MetraHealth Insurance Company; United Health Care Insurance Company; TAO, Inc.; Greenspring of Eastern Pennsylvania; St. Joseph Hospital, Baldpate Hospital: and Southern New Hampshire Medical Center, Defendants.

Civil Action No. 97–10191–WGY.

United States District Court, D. Massachusetts.

Oct. 30, 1997.

Richard J. Leonard, Haverhill, MA, for Diane Andrews–Clarke.

M. Therese Roche, Roche, Heifetz, Murphy & Wholley, Boston, MA, Michael B. O'Shaughnessy, Claire W. Rouillard, Robert J. Meagher, McDonough & O'Shaughnessy, Manchester, NH, for St. Joseph's Hosp.

William J. Davenport, Bloom & Buell, Boston, MA, for Baldpate Hosp.

Michael A. Pignatelli, Rath, Young & Pignatelli, P.A., Nashua, NH, for Southern New Hampshire Medical Center.

Joan O. Vorster, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, Scott Kirschbaum, Adorno & Zeder, Miami, FL, for Travelers Ins. Co., MetraHealth Ins. Co. and United Health Care Ins. Co.

Mark E. Cohen, Brian C. Duffey, McCormack & Epstein, Boston, MA, Susan Hughes Banning, James P. Warner, Hemenway & Barnes, Boston, MA, Arthur N. Lerner, David Florin, Beth M. Kramer, David W. O'Brien, Michaels, Wishner & Bonner, Washington, DC, for TAO, Inc.

Susan Hughes Banning, James P. Warner, Hemenway & Barnes, Boston, MA, Arthur N. Lerner, David Florin, Beth M. Kramer, David W. O'Brien, Michaels, Wishner & Bon-

ner, Washington, DC, for Greenspring of Eastern Pennsylvania.

## MEMORANDUM

YOUNG, District Judge.

Surveys show many people think the insurance industry's drive to cut costs has reduced dramatically the overall quality of health care, limiting not only their access to the best doctors and hospitals but also putting such time and financial strain on physicians that they can't possibly provide first-rate treatment.... [1] Hospital officials acknowledged that the cuts on hospital budgets have been steep and swift, occurring mostly because health insurers have scaled back the amount they reimburse hospitals to care for patients. As a result, hospitals are under pressure to send patients home sooner and sicker.[2] Here's what's happening; support for training doctors is dwindling, and research is under great financial pressure. The quality of delivered health care services is being squeezed, inexorably, by insurers who insist on paying less and less, because that's what their corporate clients insist on; financial incentives are being provided to reward "doing less"; fewer Americans have access to health insurance institutions.

Dr. Lowell E. Schnipper, M.D.[3]

Here's what happened in this case.[4] Richard J. Clarke and his wife, Diane Andrews–Clarke, lived in Haverhill, Massachusetts, with their four young children, Deanna, Lacey, Carly, and Justin. Diane Andrews–Clarke, an employee of AT & T,[5] maintained a family health insurance policy with Travelers Insurance Co.[6] through her AT & T employee benefit plan.[7] Her husband and children were named beneficiaries of that policy.

Richard Clarke drank to excess. On April 22, 1994, Dr. Smita Patel admitted Richard Clarke to St. Joseph Hospital in Nashua, New Hampshire, for alcohol detoxification and medical evaluation. St. Joseph Hospital contacted Greenspring,[8] the utilization review provider [9] that must pre-approve treatment

---

1. Mary Leonard, *'Boutique Medicine' is Not for Everybody*, Boston Globe, July 6, 1997, at C1.

2. Alex Pham, *Nurses' Staffing Levels* Debated, Boston Globe, May 16, 1997, at C1.

3. Lowell E. Schnipper, Editorial, *As medical titans battle, what happens to the patients?*, Boston Globe, Apr. 3, 1997, at A17. Dr. Lowell E. Schnipper is chief of medical oncology at Beth Israel Deaconess Medical Center.

4. The facts recited herein are gleaned from the face of the Complaint in accordance with Fed. R.Civ.P. 12(b)(6). In ruling on a motion to dismiss, this Court must take the material facts alleged in the Complaint as true and view them in the light most favorable to the plaintiff. *Deren v. Digital Equip. Corp.*, 61 F.3d 1, 1 (1st Cir. 1995). More precisely, the Court draws on the factual allegations of the Plaintiff's proposed Second Amended Complaint.

In her proposed Second Amended Complaint, the Plaintiff sought to 1) assert certain additional claims against Travelers and Greenspring, 2) abandon her federal claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and 3) add AT & T as a defendant. At a motion session on March 26, 1997, this Court allowed the first two categories of amendments, but did not grant the Plaintiff leave to add AT & T as a defendant.

5. American Telephone and Telegraph, Inc.

6. In addition to Travelers, the Complaint names MetraHealth Insurance Company and United Health Care Insurance Company as defendants, and alleges that each is a successor of the other. For simplicity, the Court will refer to all three of these defendants collectively as "Travelers."

7. It is undisputed that the AT & T plan constitutes an "employee welfare benefit plan" within the meaning of Section 3(1) of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1002(1).

8. The Complaint names both Greenspring of Eastern Pennsylvania and TAO, Inc. as defendants. In early 1994, TAO, Inc. contracted with Travelers Insurance Co. to provide utilization review services for the AT & T employee benefit plan. Greenspring purchased TAO in July, 1994, and TAO no longer operates as a separate entity. For purposes of simplicity, this Court will therefore refer to TAO and Greenspring collectively as "Greenspring."

9. Utilization review refers to an external evaluation of the appropriateness of a given course of treatment based upon established clinical criteria. Most "managed care" health plans use prospective and concurrent utilization review as a

under the terms of Clarke's health plan, regarding Clarke's admission. Greenspring authorized only a five day hospital stay for detoxification. Despite the fact that the Travelers' insurance policy held by Andrews–Clarke specifically stated that each insured beneficiary is entitled to at least one thirty day inpatient rehabilitation program per year, Greenspring refused to approve Clarke's enrollment in a thirty day inpatient alcohol rehabilitation program.

After this five day hospital stay, Clarke was discharged from St. Joseph Hospital with a diagnosis of alcohol dependence, alcohol withdrawal symptoms, elevated liver function, and low hemoglobin. He remained alcohol-free for twenty-five days, but then resumed drinking. On September 12, 1994, he voluntarily admitted himself to Baldpate Hospital in Georgetown, Massachusetts, seeking help to stop drinking. Although aware both of Clarke's medical condition and the clear terms of the Travelers' insurance policy, Greenspring refused to authorize more than eight days of inpatient treatment. Baldpate discharged Clarke on September 20, 1994.

Less than twenty-four hours later, Clarke drank a substantial amount of alcohol, ingested cocaine, swallowed a handful of prescription drugs, and attempted to commit suicide by locking himself in the garage with the car engine running. His wife saved his life, breaking through the garage door to find him slumped on the floor. She shut off the car engine and dialed 911. Although Clarke had no detectable pulse or respiration when the ambulance arrived, the paramedics were able to revive him. Clarke was then flown to Henrietta Goodall Hospital in Sanford, Maine, where he was placed in a hyperbaric chamber and successfully treated for carbon monoxide poisoning.

By now, it was tragically apparent to everyone but Travelers and its agent, Greenspring, that Clarke was a danger to himself and perhaps others. After conducting a commitment hearing,[10] the Haverhill District Court so found, and ordered Clark committed to a thirty-day detoxification and rehabilitation program. The court referred the issue of Clarke's placement to the Court Clinic, which in turn sought Greenspring's approval for an insured admission to a private hospital. When Greenspring—despite the fact that enrollment in a thirty-day inpatient detoxification program is a defined benefit of the Travelers insurance policy—incredibly refused to authorize such a private admission, the court ordered Clarke committed to the Southeastern Correctional Center at Bridgewater for his detoxification and rehabilitation.[11]

Clarke's life now spiralled inexorably down and out of control. While a patient at Bridgewater, he was forcibly raped and sodomized by another inmate in his unit. He received little in the way of therapy or treatment. After his release from Bridgewater on October 25, 1994, he made his way back to Haverhill where his wife and four minor children still lived. Diane Andrews–Clarke told Clarke that he could return to the marital home only if he remained sober. Unable to do so without hospitalization, Clarke began a three-week drinking binge.

After an episode of heavy drinking on November 10, 1994, Clarke was placed in protective custody by the Pelham, New Hampshire, police. Later that day, he was admitted to the Southern New Hampshire Medical Center in full respiratory arrest,

---

strategy to control costs. A managed care insurer may either perform the utilization review itself, or, as was the case here, assign the task to a third party contractor. *See Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1323 (5th Cir. 1992), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992) (citations omitted); *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 352 n. 1 (3rd Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995); Jennifer A. Hradil, Comment, *Patchwork Patient Protection: Must We Choose a Single Pattern?*, 27 Seton Hall L.Rev. 203, 210–11 & n. 32 (1996).

**10.** See Mass. Gen. L. ch. 123, § 35.

**11.** By breaking its contract with the Clarkes and thus containing its own costs, Travelers shifted these costs to the citizens of the Commonwealth in the form of increased taxes. As will become apparent, the Congress of the United States has, as a functional matter, authorized Travelers to impose these taxes on the citizens of the Commonwealth.

with a blood alcohol level of .380 and a head injury. Southern New Hampshire Medical Center made no effort to treat Clarke's alcoholism and did not seek to obtain a detoxification admission at any other facility. Clarke spent the night sleeping on a stretcher because it was too cold to discharge him and there were no beds available in area shelters. He was released the next morning.

Upon leaving Southern New Hampshire Medical Center, Clarke purchased a six-pack of Meisterbrau beer, which he immediately began to consume. At 3:06 a.m. on November 12, 1994, the Pelham, New Hampshire, police discovered Clarke's body in a parked car, with a garden hose extending from the tailpipe to the passenger compartment. Clarke, age forty-one, sat lifeless in the front seat, clasping a sixteen ounce beer can in his right hand. He was pronounced dead at the scene.

Subsequent to Clarke's death, Diane Andrews–Clarke commenced this action against Travelers and Greenspring in the Superior Court of the Commonwealth of Massachusetts sitting in and for the County of Essex, individually and as administratrix of Clarke's estate and as next friend of their four minor children.[12] Andrews–Clarke asserts that her husband's death was the direct and foreseeable result of the improper refusal of Travelers and its agent Greenspring to authorize appropriate medical and psychiatric treatment during Clarke's repeated hospitalizations for alcoholism in 1994. She brought claims against them for breach of contract, medical malpractice, wrongful death, loss of parental and spousal consortium, intentional and negligent infliction of emotional distress, and specific violations of the Massachusetts consumer protection laws.[13]

Travelers and Greenspring promptly removed her case to this Court[14] and then, just as promptly, asked this Court to throw her out without hearing the merits of her claim.[15]

This, of course, is ridiculous. The tragic events set forth in Diane Andrews–Clarke's Complaint cry out for relief. Clarke was the named beneficiary of a health insurance policy offered through an employee benefit plan. That policy expressly provided coverage for certain medical and psychiatric treatments, including enrollment in a thirty-day inpatient alcohol detoxification and rehabilitation program. Doctors at several hospitals, and even the courts of the Commonwealth of Massachusetts, determined that Clarke was in need of such treatment, but the insurer and its agent, the utilization review provider, repeatedly and arbitrarily refused to authorize it. As a consequence of their failure to pre-approve—whether willful, or the result of negligent medical decisions made during the course of utilization review—Clarke never received the treatment he so desperately required, suffered horribly, and ultimately died needlessly at age forty-one.

Under traditional notions of justice, the harms alleged—if true—should entitle Diane Andrews–Clarke to some legal remedy on behalf of herself and her children against Travelers and Greenspring. Consider just one of her claims—breach of contract. This cause of action—that contractual promises can be enforced in the courts—pre-dates

12. The Plaintiff also brought claims against three of the hospitals that treated Clarke in 1994—St. Joseph Hospital, Southern New Hampshire Medical Center, and Baldpate Hospital. This Court, however, dismissed the claims against Southern New Hampshire Medical Center and St. Joseph Hospital for lack of personal jurisdiction. The Plaintiff's state law claims against Baldpate Hospital remain in suit, but have been referred to the Medical Malpractice Tribunal and are no longer before this Court.

13. Diane Andrews–Clarke invokes Massachusetts General Laws ch. 93A, ch. 176D, § 3, and ch. 175 § 47B. Mass. Gen. L. ch. 93A is a Consumer Protection Act that prohibits unfair or decep-

tive acts or practices by persons engaged in the conduct of "trade or commerce." Mass. Gen. L. ch. 93A, § 2.

Mass. Gen. L. ch. 176D, § 3 defines unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.

Mass. Gen. L. ch. 175, § 47B requires any insurance policy that furnishes coverage for hospital and surgical expenses to also provide certain minimum mental health care benefits.

14. *See* 28 U.S.C. § 1441.

15. *See* Fed.R.Civ.P. 12(b)(6).

Magna Carta.[16] It is the very bedrock of our notion of individual autonomy and property rights. It was among the first precepts of the common law to be recognized in the courts of the Commonwealth [17] and has been zealously guarded by the state judiciary from that day to this.[18] Our entire capitalist structure depends on it.[19]

Nevertheless, this Court had no choice but to pluck Diane Andrews–Clarke's case out of the state court in which she sought redress (and where relief to other litigants is available) and then, at the behest of Travelers and Greenspring, to slam the courthouse doors in her face and leave her without any remedy.[20]

This case, thus, becomes yet another illustration [21] of the glaring need for Congress to amend ERISA to account for the changing realities of the modern health care system. Enacted to safeguard the interests of employees and their beneficiaries, ERISA has evolved into a shield of immunity that protects health insurers, utilization review providers, and other managed care entities from potential liability for the consequences of their wrongful denial of health benefits.

■ All of Diane Andrews–Clarke's cognizable state law causes of action [22] arise out

---

**16.** E. Allan Farnsworth, *Contracts*, §§ 1.4—1.6 (2d ed.1990).

**17.** *See, e.g.,* Thomas G. Barnes, *Thomas Lechford and the Earliest Lawyering in Massachusetts, 1638–41, in Law in Colonial Massachusetts, 1630–1800* 3, 17–18, 21 (The Colonial Society of Massachusetts 1984)(describing the various contractual legal forms used by Thomas Lechford, one of the very first "practicers" of law in the Commonwealth of Massachusetts). Indeed, in The *Virgin and the Virgin's Sister: Virginia, Massachusetts, and the Contested Legacy of Colonial Law,* David Thomas Konig argues that Virginia, to market its tobacco crops in England, had developed an extensive credit economy well ahead of Massachusetts, an economy that depended on a wide array of contractual obligations enforceable in courts of law. Supreme Judicial Court Historical Society, *The History of the Law in Massachusetts: The Supreme Judicial Court, 1692–1992* 81, 99–100, 103–15 (Russell K. Osgood ed., 1992).

**18.** *See, e.g., Shea v. Emmanuel College,* 425 Mass. 761, 682 N.E.2d 1348 (1997); *Berman v. Linnane,* 424 Mass. 867, 679 N.E.2d 174 (1997).

**19.** This insight comes from the Hon. Sameh El Forgoman, a judge of the court of general trial jurisdiction in Egypt. Judge El Forgoman, an expert in international finance, spent a week sitting with this Court. I took him to lunch with my son who, with the brashness of youth, asked why an international financial scholar was hanging around with a workaday trial judge. "Yes," responded Judge El Forgoman, "but Egypt needs investment. I'm watching how you protect all your people, including investors, in the courts. No one will invest unless they can have justice."

**20.** Accordingly, on September 24, 1997, this Court granted the motion to dismiss by Travelers Insurance Company, MetraHealth Insurance Company, United HealthCare Insurance Company, TAO, Inc., and Greenspring of Eastern Pennsylvania in its entirety (Pleadings No. 3 & 18). This Court ruled that Diane Andrews–Clarke

does not have cognizable claims under Mass. Gen. L. ch. 176D, § 3, or ch. 175, § 47B because neither of these statutes confers a private right of action. All of her other state law claims against Travelers, Greenspring, and their successors in interest are preempted by section 514(a) of ERISA. Indeed, since this order entered, the First Circuit decided *Turner v. Fallon Community Health* Plan, 127 F.3d 196 (1st Cir.1997), an opinion that covers the same ground as discussed herein and leaves no doubt but that this Court had no choice but to throw Diane Andrews–Clarke out of court.

**21.** *See also Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 943 (6th Cir.1995) ("One consequence of ERISA preemption, therefore, is that plan beneficiaries or participants bringing certain types of state actions—such as wrongful death—may be left without a meaningful remedy."); *Corcoran,* 965 F.2d at 1338–39 ("The result ERISA compels us to reach means the [Plaintiff has] no remedy, state or federal, for what may have been a serious mistake."); *Turner v. Fallon Community Health Plan,* 953 F.Supp. 419, 424 (D.Mass.1997) (Gorton, J.), *aff'd,* 127 F.3d 196 (1st Cir.1997) ("An unfortunate consequence of ERISA preemption is, therefore, that plan beneficiaries or participants who bring certain kinds of state actions, *e.g.,* wrongful death, may be left without a meaningful remedy .... Sadly, the case at bar compels a like result. Plaintiff's state common law claims are preempted by the broadly sweeping arm of ERISA. Plaintiff is left without any meaningful remedy even if he were to establish that [the insurer] wrongfully refused to provide the [bone marrow transplant] his wife urgently sought.").

**22.** In Counts VIII and IX of the Second Amended Complaint, Andrews–Clarke alleges violations of Mass. Gen. L. ch. 176D § 3 and ch. 175, § 47B. Both of these provisions regulate insurance within the meaning of ERISA's "savings clause," 29 U.S.C. § 1144(b)(2)(A), and therefore are not subject to ERISA preemption. *Metropolitan Life*

of the alleged improper processing of

*Ins. Co. v. Massachusetts*, 471 U.S. 724, 745–46, 105 S.Ct. 2380, 2392–93, 85 L.Ed.2d 728 (1985). Unfortunately, neither of these provisions confers a private right of action.

This Court has previously noted that, as matter of Massachusetts law, chapter 176D, standing alone, does not confer a private right of action. *Pariseau v. Albany Intern. Corp.*, 822 F.Supp. 843, 845 (D.Mass.1993) (citing *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 365 N.E.2d 802 [1977]). Furthermore, in *Pariseau*, this Court held that although chapter 93A, § 9(1) provides that a violation of chapter 176D, § 3(9) ipso facto constitutes a chapter 93A violation, as enforced through chapter 93A, chapter 176D does not fall within the safe harbor of ERISA's savings clause. *Id.* at 845–46 (citing *Metropolitan Life*, 471 U.S. at 742–43, 105 S.Ct. at 2390–91; *see also Ryan v. Fallon Community Health Plan*, 921 F.Supp. 34, 38 (D.Mass.1996) (Gorton, J.). Thus, the Plaintiff may not assert a claim under chapter 176D, either directly or via chapter 93A.

With respect to Mass. Gen. L. ch. 175, § 47B, the language of the statute does not authorize a private right of action, and there are no published Massachusetts decisions addressing the question whether one should be implied. As this Court sees no indication of a legislative intent to confer a private right of action, and it appears that the statute was enacted to benefit the public in general rather than a particular class of beneficiaries, this Court holds that the implication of a remedy is inappropriate. *See Ludlow Educ. Ass'n v. Town of Ludlow*, 31 Mass.App.Ct. 110, 119, 644 N.E.2d 227 (1991) (citing *Dinsky v. Town of Framingham*, 386 Mass. 801, 805–10, 438 N.E.2d 51 [1982]).

The Massachusetts General Court could easily remedy this lacunae if it chose. As noted below, however, insurance industry lobbying is extraordinarily effective, *see infra* note 78, and sometimes illegal, see Judith Rakowsky, *Ex-Hancock Lobbyist Gets Fine, Probation; Judge Derides Prosecution's Case*, Boston Globe, Nov. 26, 1996, at A1 (noting that John Hancock Mutual Life Insurance Company paid over $1,100,000.00 in federal civil penalties and state ethics fines to avoid criminal prosecution stemming from a federal probe of illegal ties between lobbyists and legislators); *see generally United States v. Sawyer*, 85 F.3d 713 (1st Cir.1996) (Stahl, J.); *United States v. Woodward*, Criminal No. 95–10234 (D.Mass.1997) (Woodlock, J.). Lobbying crimes are not 'victimless.' All that money buys something.

**23.** The Plaintiff's claims for breach of contract, negligent and intentional infliction of emotional distress, and violations of Mass. Gen. L. ch. 93A unabashedly seek relief for the denial of plan benefits, and are therefore preempted. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987).

Clarke's claims for benefits under an ERISA employee benefit plan,[23] and are therefore

In the malpractice claim and the derivative counts for wrongful death and loss of consortium, Diane Andrews–Clarke asserts that Travelers and its agent Greenspring negligently failed to diagnose the severity of Clarke's condition during the utilization review process, and subsequently failed to administer appropriate treatment. Although Texas and California have recognized that a patient may assert a malpractice claim against a managed care organization based upon a theory of direct liability for medically inappropriate decisions made during the implementation of a cost containment mechanism such as utilization review, 1997 Tex. Sess. Law Serv. 163 (West); *Wickline v. State*, 192 Cal. App.3d 1630, 1645, 239 Cal.Rptr. 810 (1986), Massachusetts has yet to consider the issue. Nevertheless, assuming that Andrews–Clarke's malpractice claims against Travelers and Greenspring are cognizable under Massachusetts law, they are preempted by ERISA. A utilization review provider makes medical decisions, but it does so in the context of making a determination about the availability of benefits under the plan, *see Corcoran*, 965 F.2d at 1332, and thus, "[t]he principle of *Pilot Life* that ERISA preempts state law claims alleging improper handling of benefit claims is broad enough to cover the cause[s] of action asserted here." *Id.; see also Tolton*, 48 F.3d at 942 ("Utilization review is a means of processing claims. . . ."); *Kuhl v. Lincoln Nat'l Health Plan*, 999 F.2d 298, 302–03 (8th Cir. 1993), *cert. denied*, 510 U.S. 1045, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994) ("[T]he decision not to precertify payment relates directly to . . . [the] administration of benefits"); *Spain v. Aetna Life Ins. Co.*, 11 F.3d 129, 131 (9th Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 340 (1994) ("[S]tate common law causes of action arising from the improper processing of a claim are preempted by federal law.") (citation omitted); *Turner*, 953 F.Supp. at 423.

With respect to the emotional distress claims, this Court notes that, despite arguments to the contrary, the First Circuit's decision in *Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 826 (1st Cir.1988), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988), is inapposite. In *Drinkwater*, the plaintiff asserted a claim for intentional infliction of emotional distress against the plan administrator of her husband's employee benefit plan, alleging that she suffered emotional distress when the defendant coerced her husband to return to work—at a time when it posed a serious risk to his health—by "threatening" to withhold his disability benefits. *Id.* at 826. The First Circuit held that the claim was not preempted by ERISA because it pertained to the defendant's alleged outrageous conduct of pressuring the plaintiff's husband to return to work, and thus did not relate to an ERISA plan, even though the means the defendant allegedly used to exert that pressure did relate to an ERISA plan. *Id.* In the case at bar, in contrast,

preempted.[24] At the same time, however, it is undisputed that ERISA's civil enforcement provision[25] does not authorize recovery for wrongful death, personal injury, or other consequential damages caused by the improper refusal of an insurer or utilization review provider to authorize treatment.[26] Thus, the practical impact of ERISA in this case is to immunize Travelers and Greenspring from *any* potential liability for the

---

Diane Andrews–Clarke does not allege that she suffered emotional distress because Travelers and Greenspring wrongfully threatened to deny Clarke his rightful benefits under the plan, but rather because they actually did deny Clarke such benefits. Accordingly, Andrews–Clarke's emotional distress claims are properly subject to ERISA preemption. *See Pilot Life*, 481 U.S. at 48, 107 S.Ct. at 1553; *Burks v. Amerada Hess Corp.*, 8 F.3d 301, 304–05 (5th Cir.1993) (emotional distress claim arising out of improper denial of benefits preempted by ERISA).

**24.** Section 514(a) of ERISA, 29 U.S.C. § 1144(a); *see Pilot Life*, 481 U.S. at 47–48, 107 S.Ct. at 1552–53; *see also New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668, 115 S.Ct. 1671, 1683, 131 L.Ed.2d 695 (1995) (noting that *Pilot Life* remains good law); *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1081–82 (1st Cir.1990) ("[C]ommon law contract and torts claims asserting the improper processing of a claim for benefits under an ERISA regulated insurance policy are preempted.").

Not every state law claim that is preempted by section 514(a) of ERISA, 29 U.S.C. § 1144(a), is subject to removal to federal court under the complete preemption exception to the well-pleaded complaint rule. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–66, 107 S.Ct. 1542, 1546–48, 95 L.Ed.2d 55 (1987). In the case at bar, however, it is unnecessary for this Court to reach the issue of complete preemption because there is no question as to the propriety of the Defendants' removal to this Court pursuant to 28 U.S.C. § 1441. At the time of removal, Diane Andrews–Clarke was asserting federal claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, in addition to the state law claims now at issue. Although she has since amended her Complaint so as to abandon the EMTALA claims, "an amendment to a complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." *Ching v. Mitre Corp.*, 921 F.2d 11, 13 (1st Cir.1990) (citations omitted).

Nevertheless, this Court notes that, even if Andrews–Clarke had never asserted the federal EMTALA claims, removal to this Court would have been justified on the basis of the complete preemption doctrine. As all of her common law claims arise out of denial of benefits under an ERISA plan, they fall squarely within the scope of ERISA's civil enforcement provision, section 502(a), 29 U.S.C. § 1132(a)(1)(B), and thus are subject to complete preemption. *Pilot Life*, 481 U.S. at 52, 107 S.Ct. at 1555–56.

**25.** Section 502, 29 U.S.C. § 1132.

**26.** *See, e.g. Tolton*, 48 F.3d at 943; *Corcoran*, 965 F.2d at 1333–34; *Turner*, 953 F.Supp. at 420; *see also* Ellyn E. Spragins, *To Sue or Not to Sue? Legal Aspects of Suing for Medical Malpractice*, Newsweek, Dec. 9, 1996, at 50.

Diane Andrews–Clarke does not seek "to recover benefits due to [Clarke] under the terms of [the] plan, to enforce [Clarke's] rights under the terms of the plan, or to clarify [Clarke's] rights to future benefits under the terms of the plan," pursuant to 29 U.S.C. § 1132(a)(1)(B). Similarly, due to Clarke's tragic death, any kind of injunctive relief pursuant to section 1132(a)(3) to enforce Clarke's rights under the plan is no longer viable. Finally, and most importantly, it is well settled that a claim for compensatory or consequential damages does not fall under the purview of "other equitable relief" available to an ERISA plan participant or beneficiary under Section 1132(a)(3). *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255, 261, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993); *Reich v. Rowe*, 20 F.3d 25, 30 (1st Cir.1994) (citing *Mertens*, 508 U.S. at 255, 113 S.Ct. at 2067–68; *Drinkwater*, 846 F.2d at 824); *Turner*, 953 F.Supp. at 425.

ERISA also authorizes a plan participant or beneficiary to seek appropriate relief under 29 U.S.C. § 1109(a) pertaining to a breach of fiduciary duty, *see* 29 U.S.C. § 1132(a)(2), but any extra-contractual damages recovered pursuant to that provision inure to the plan itself rather than to the individual beneficiary. *See Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140–44, 105 S.Ct. 3085, 3089–91, 87 L.Ed.2d 96 (1985); *see also Varity Corp. v. Howe*, 516 U.S. 489, 508, 515, 116 S.Ct. 1065, 1076, 1079, 134 L.Ed.2d 130 (1996) (holding that a participant or beneficiary may recover individualized "equitable relief" for a breach of a fiduciary duty pursuant to 29 U.S.C. § 1132[a][3], but,reiterating the holding of *Mertens*, 508 U.S. at 255–58, 113 S.Ct. at 2067–69, that compensatory damages do not constitute "equitable relief" within the meaning of section 1132[a][3] ).

Despite arguments to the contrary, it is widely recognized that the absence of a comparable remedy under ERISA does not alter the analysis concerning preemption of the state law claims. *See, e.g., Turner*, 127 F.3d at 198–200; *Tolton*, 48 F.3d at 943; *Corcoran*, 965 F.2d at 1333; *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 418–19 (4th Cir.1993); *First Nat'l Life Ins. Co. v. Sunshine–Jr. Food Stores*, 960 F.2d 1546, 1550 (11th Cir.1992); Lister v. Stark, 890 F.2d 941, 946 (7th Cir.1989).

consequences of their denial of benefits.[27]

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."[28] It is therefore deeply troubling that, in the health insurance context, ERISA has evolved into a shield of immunity which thwarts the legitimate claims of the very people it was designed to protect.[29] What went wrong?

### ERISA—The Legal "Pac Man"

Several commentators place the blame on the Supreme Court's historically broad construction of ERISA's key preemption provision.[30] Indeed, the proper boundaries of

27. Several recent cases have held that when the doctors who actually treated the plan beneficiary are actual or ostensible agents of the plan (as is often the case in a staff-model HMO) a malpractice claim against the plan based upon a theory of **vicarious** liability is not preempted by ERISA. *See, e.g., Nascimento v. Harvard Community Health Plan, Inc.*, No. 94–2534, slip op. at 1, 11–12 (Mass.Super.Ct. Sept. 26, 1997) (McHugh, J.) (malpractice claim against doctor and doctor's employer, Harvard Community Health Plan, not preempted by ERISA because the question of whether the Plan's doctor negligently diagnosed or wrongfully withheld treatment from the plaintiff "requires no reference whatsoever to the terms of the plan"); *Pacificare of Oklahoma v. Burrage*, 59 F.3d 151, 155 (10th Cir.1995) (malpractice claim at issue does not challenge the administration of benefits under an ERISA plan, but rather alleges that the decedent received negligent treatment from a doctor who was held out by the HMO as its agent); *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 361 (3rd Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995) ("[T]here is no allegation here that the HMOs denied anyone any benefits that they were due under the plan. Instead, the plaintiffs are attempting to hold the HMOs liable for their role as the arrangers' of their decedents' medical treatment."); *see also* F. Christopher Wethly, *New York Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.: Vicarious Liability Malpractice Claims Against Managed Care Organizations Escaping ERISA's Grasp*, 37 B.C. L.Rev. 813, 855–59 (1996).

In the case, at bar, however, the malpractice claims against Travelers and Greenspring are premised upon a theory of **direct** rather than vicarious liability. Diane Andrews–Clarke does not allege that the doctors who treated Clarke at St. Joseph Hospital, Southern New Hampshire Medical Center, or Baldpate Hospital were actual or ostensible agents of Travelers or Greenspring, or that Travelers or Greenspring directed Clarke to seek treatment at these hospitals, but rather wishes to recover for negligent medical decisions made during the utilization review process.

As a general matter, this Court further notes that the vicarious liability crack in the shield of ERISA preemption is one of narrow applicability. Unlike fully integrated staff-model HMOs, which hire physicians as employees, the majority of managed care plans contract with independent groups or networks of physicians. *See* Richard C. Reuben, *In Pursuit of Health: With*

*More Patients Suing HMOs for Denial of Treatment Lawyers are Exploring New Ground in Going Up Against the Managed–Care Giant*, 82–Oct. A.B.A. J. 55, 56 (1996); Wethly, *Vicarious Liability Malpractice Claims*, 37 B.C. L.Rev. at 819–20. A beneficiary cannot assert a malpractice claim against such a plan premised upon a theory of vicarious liability unless she can demonstrate that the plan held out the treating physician as its employee. *See Chase v. Independent Practice Ass'n, Inc.*, 31 Mass.App.Ct. 661, 666–68, 583 N.E.2d 251 (1991). This showing will become increasingly difficult as managed care plans begin to realize that a clear communication to its enrollees that the plan does not directly furnish medical treatment is all that is necessary to avoid liability.

28. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) (citations omitted); *see also* 29 U.S.C. § 1001(c); 120 Cong. Rec. 29,193 (Aug. 20, 1974) (statement of Sen. Biaggi describing ERISA as an employee's "version of an emancipation proclamation").

29. This Court further notes that although ERISA regulates both employee pension plans and employee welfare benefit plans—including those that provide, "through the purchase of insurance or otherwise, ... medical, surgical, or hospital care or benefits," 29 U.S.C. 1002(1)(A)—the primary impetus for its passage was to stop certain abuses involving employee **pension** plans. *See* H.R.Rep. No. 807, 93d Cong., 2d Sess. 8 (1974), *reprinted* in 1 § 74 U.S.C.C.A.N. 4670, 4676–77. In contrast to the sweeping requirements that ERISA imposes upon employee pension plans,

ERISA itself has little to do with the regulation of health finance; it simply imposes fiduciary and reporting obligations on private employee benefit plans. ERISA does not require employers to provide health insurance or any other benefit; it does not regulate what employers can charge for benefits; it does not prevent employers from eliminating benefits (except pensions).

Catherine L. Fisk, *The Last Article About the Language of ERISA Preemption? A Case Study of the Failure of Textualism*, 33 Harv. J. on Legis. 35, 36–37 & n. 5 (1996).

30. *See, e.g.*, Larry J. Pittman, *ERISA's Preemption Clause and the Health Care Industry: An Abdication of Judicial Law–Creating Authority*, 46 Fla. L.Rev. 355, 356–57 (1994); Fisk, *The Last Article*

ERISA preemption have been the subject of considerable debate.[31] Until recently, the Supreme Court focused almost exclusively upon the "deliberately expansive" language [32] of section 514(a) in interpreting its scope:

> The **key** to § 514(a) is found in the **words** "relate to." Congress used those words in their broad sense, rejecting more limited pre-emption language that would have made the clause "applicable only to state laws relating to the specific subjects covered by ERISA."... A law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." [33]

In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), however, the Supreme Court abruptly abandoned this strict textualist interpretation in favor of a more pragmatic approach.[34] Acknowledging that if the term "relate to" were "taken to extend to the furthest stretch of its indeterminacy," ERISA preemption would be boundless, the Travelers court held that, to determine if the "starting presumption that Congress does not intend to supplant state law," [35] has been overcome in a particular case,

> we must go **beyond the unhelpful text** and the frustrating difficulty of defining its key term ["relates to"], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.[36]

The most catastrophic consequences of overbroad interpretation of "relates to" preemption would thus appear to be waning. In three decisions since *Travelers*, the Supreme Court has further reinforced this more constrictive reading of section 514(a).[37] Still,

---

*About the language of ERISA Preemption?*, 33 Harv. J. on Legis. at 39–40.

This provision, section 514(a), provides that, subject to certain exceptions, ERISA shall "supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The term "state law" encompasses statutory mandates, court decisions, and all other sources of state law. 29 U.S.C. § 1144(c)(1).

"Perhaps no phrase causes such havoc in legislative drafting as the use of the two words 'relating to.' The reason is simple—as all life, like law is a seamless web, employment of the phrase 'relating to' is essentially meaningless." *Doricent v. American Airlines, Inc.*, Civil Action No. 91–12084–Y, 1993 WL 437670, at *7 (D.Mass. Oct.19, 1993) (paraphrasing Oliver W. Holmes, *The Common Law* 1 [1945]) (other citations omitted). For this reason, courts have long recognized that inclusion of this term in a request for production of documents pursuant to Fed. R.Civ.P. 34 at once renders the request void as overbroad. *See, e.g., Commonwealth of Massachusetts Dep't Of Public Welfare v. United States Dep't of Health & Human Servs.*, 727 F.Supp. 35, 36 n. 2 (D.Mass.1989).

**31.** ERISA preemption has generated "an avalanche of litigation in the lower courts." *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, —— U.S. ——, —— n. 1, 117 S.Ct. 1747, 1749 n. 1, 138 L.Ed.2d 21 (1997). A Westlaw search of all federal and state cases, conducted in June of 1997, revealed 4,963 cases addressing the question of ERISA preemption. Noting the statute's broad impact, this Court has previously compared ERISA to "a 'Pac Man' that runs around the legal landscape, [somewhat indiscriminately] eating up other claims." *Nwogugu v. KPMG Peat*

*Marwick*, Civil Action No. 97–10282, Motion Session (June 19, 1997).

**32.** *Pilot Life*, 481 U.S. at 46, 107 S.Ct. at 1552.

**33.** *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138–39, 111 S.Ct. 478, 482–83, 112 L.Ed.2d 474 (1990) (quoting *Shaw v. Delta Air Lines*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 [1983]) (emphasis added); *see also Pilot Life*, 481 U.S. at 47–48, 107 S.Ct. at 1552–53.

**34.** *See* Fisk, *The Last Article About the Language of ERISA Preemption?*, 33 Harv. J. on Legis. at 39–40.

**35.** *Travelers*, 514 U.S. at 654, 115 S.Ct. at 1676.

**36.** *Id.* at 656, 115 S.Ct. at 1677 (emphasis added); *see* Fisk, *The Last Article About the Language of ERISA Preemption?*, 33 Harv. J. on Legis. at 39–40.

**37.** *See De Buono*, —— U.S. at —— ——, 117 S.Ct. at 1751–52 ("There is nothing in the operation of [this state tax] that convinces us it is the type of state law that Congress intended ERISA to supersede"); *Boggs v. Boggs*, —— U.S. ——, ——, 117 S.Ct. 1754, 1760, 138 L.Ed.2d 45 (1997) ("We can begin, and in this case end, the [preemption] analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects"); *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.*, —— U.S. ——, ——, 117 S.Ct. 832, 838, 136 L.Ed.2d 791 (1997) ("[A]n 'uncritical literalism' in applying [the preemption] standard

once the Supreme Court has spoken, it rarely backtracks.[38] The *Travelers* court made clear that its prior ruling in *Pilot Life* remains good law.[39]

Nevertheless, in the view of this Court, the outcome in this case is not the result of an overbroad reading of "relates to" preemption. Unlike the hospital surcharge statute at issue in *Travelers*, which had only an indirect economic influence on plan administration,[40] here Diane Andrews–Clarke's claims go right to the heart of the benefit determination process.[41] To permit these claims to go forward would contravene the intent of Congress to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law ... [and] minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government."[42] As the Fifth Circuit noted in *Corcoran*, "it would be incompatible with the language, structure, and purpose of [ERISA] to allow [state] tort suits against entities so integrally connected with a plan."[43]

This Court acknowledges that, in adopting ERISA's preemption provision, Congress in-

tended to relieve employers and ERISA plans from the burdens of compliance with conflicting state laws not as an end in and of itself, but rather as a means to promote the principal object of ERISA as a whole—"to protect plan participants and beneficiaries."[44] At the time of its enactment, however, ERISA **did** provide an adequate remedy for the wrongful denial of health benefits. The present gap in remedies is therefore attributable not to an overbroad application of ERISA's preemption clause, but rather to the failure of Congress to amend ERISA's civil enforcement provision to keep pace with the changing realities of the health care system.

When Congress passed ERISA in 1974, traditional fee-for-service insurance plans dominated the American health care industry.[45] Under this model of health care delivery, a plan beneficiary who was ill or injured would visit the doctor of her choice, receive treatment, and then send the bill to her health insurer.[46] If the insurer improperly refused to pay, the beneficiary could be made whole by commencing suit to recover the cost of the treatment pursuant to ERISA.[47]

offer[s] scant utility in determining Congress' intent as to the extent of § 514[a]'s reach.").

38. *See, e.g., Neal v. United States*, 516 U.S. 284, 292–93, 116 S.Ct. 763, 768–69, 133 L.Ed.2d 709 (1996) (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707 [1977]) (other citations omitted) ("Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of stare decisis.... One reason that we give great weight to stare decisis in the area of statutory construction is that 'Congress' is free to change this Court's interpretation of its legislation.'").

39. *Travelers*, 514 U.S. at 668, 115 S.Ct. at 1683.

40. *See id.* at 658–59, 115 S.Ct. at 1678–79.

41. *See Turner*, 127 F.3d at 199 ("It would be difficult to think of a state law that 'relates' more closely to an employee benefit plan than one that affords remedies for the breach of obligations under that plan.").

42. *Ingersoll–Rand*, 498 U.S. at 142, 111 S.Ct. at 484–85.

43. *Corcoran*, 965 F.2d at 1334.

44. *Boggs*, —— U.S. at ——, 117 S.Ct. at 1762 (citing *Shaw*, 463 U.S. at 90, 103 S.Ct. at 2896); *see Ingersoll–Rand*, 498 U.S. at 142, 111 S.Ct. at 484–85; *see* also Fisk, *The Last Article About the Language of ERISA Preemption?*, 33 Harv. J. on Legis. at 94 ("[T]he legislative history [of ERISA] does not suggest that Congress intended preemption to minimize the administrative or financial burdens on plans irrespective of the harm that elimination of state law could cause to plan participants.")

In *Crespo v. Candela Laser Corp.*, 780 F.Supp. 866 (D.Mass.1992), this Court stated that ERISA has a "two-fold intent: to protect the employees from the consequences of underfunding of pension and welfare benefit plans, as well as to protect employers from inconsistent state and local regulation of such plans...." *Id.* at 869. This Court now makes clear that the second objective is ancillary to the first.

45. *See* Kent G. Rutter, *Democratizing HMO Regulation to Enforce the 'Rule of Rescue'*, 30 Mich. L.Rev. 147, 171 (1996).

46. Wethly, *Vicarious Liability Malpractice Claims*, 37 B.C. L.Rev. at 817.

47. 29 U.S.C. § 1132(a)(1)(B).

Today, in contrast, 75% of insured American workers and their beneficiaries receive their health care through some type of "managed care" plan.[48] As a strategy to control costs, most managed care plans perform utilization review prior or concurrent to a proposed course of treatment to determine if it is medically necessary.[49] "By its very nature, a system of prospective decision-making influences the beneficiary's choice among treatment options to a far greater degree than does the theoretical risk of disallowance of a claim facing a beneficiary in a retrospective [fee-for-service] system ... [T]he perception among insurers that prospective determinations result in lower health care costs is premised on the likelihood that a beneficiary, faced with the knowledge of specifically what the plan will or will not pay for, will choose the treatment option recommended by the plan in order to avoid risking total or partial disallowance of benefits."[50] Accordingly, in the managed care context, the wrongful denial of benefits by an insurer—whether intentional, or the result of negligent medical decisions made during the utilization review process—will sometimes result in the beneficiary never receiving the treatment that she requires, and thus can lead to damages far beyond the out-of-pocket cost of the treatment at issue.

ERISA's civil enforcement provision, however, does not authorize recovery for wrongful death, personal injury, or other consequential damages caused by an improper refusal of an insurer or utilization review provider to authorize treatment.[51] ERISA permits a beneficiary to seek an injunction ordering an insurer to authorize the disputed treatment,[52] but such action is often impractical, either because of time constraints or—as was the case here—the incapacity of the beneficiary brought on by his medical condition. Thus, if a beneficiary never receives treatment because of the insurer's failure to pre-approve, ERISA leaves him without any meaningful remedy.

Faced by the absurd result here, some members of Congress—and a host of commentators—have suggested that courts should nevertheless imply such a remedy in order to uphold ERISA's overriding objective of promoting the interests of plan participants and beneficiaries.[53] The Supreme

**48.** Andy Miller, *Managed Care Savings Noted,* Atlanta J. & Atlanta Const., June 5, 1997, at E3. "Managed care" health plans attempt to control costs by integrating—to varying degrees—the financing and delivery of health care services. John K. Iglehart, *Health Policy Report: The American Health Care System -Managed* Care, 227 New Eng. J. Med. 742, 742 (1992). "[M]anaged care originated with Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs), but today, managed care is an element of most health care delivery systems." Hradil, *Patchwork Patient Protection,* 27 Seton Hall L.Rev. at 203 n. 1.

**49.** Hradil, *Patchwork Patient Protection,* 27 Seton Hall L.Rev. at 211. Prospective utilization review requires prior approval of treatment, while concurrent utilization review "monitors and evaluates treatment to determine if a modification of patient treatment is warranted." *Id.* at 210 n. 32.

In addition to prospective and concurrent utilization review, other common cost containment strategies used by managed care plans include 1) contracts between the plan and networks of physicians and hospitals to furnish a comprehensive set of health services to enrolled members, usually for a predetermined monthly premium; 2) financial incentives for patients to use the providers and facilities affiliated with the plan; 3) financial incentives that reward physicians for re-

ducing the costs of care (*e.g.* capitation); and 4) the use of primary care physicians as gatekeepers. *See* Iglehart, *Health Policy Report,* 327 New Eng. J. Med. at 742; Stephen R. Latham, *Regulation of Managed Care Incentive Payments to Physicians,* 22 Am. J.L. & Med. 399, 401–02 (1996).

**50.** *Corcoran,* 965 F.2d at 1332.

**51.** *See, e.g., Tolton,* 48 F.3d at 943; *Corcoran,* 965 F.2d at 1325–26; *Turner,* 953 F.Supp. at 424–25.

**52.** 29 U.S.C. § 1132(a)(3).

**53.** *See, e.g.,* Pittman, *ERISA's Preemption Clause and the Health Care Industry: An Abdication of Judicial Law–Creating Authority,* 46 Fla. L.Rev. at 436–40; Committee on the Budget, House of Representatives, H.R. Rep. 101–247, 101st Cong., 1st Sess. 56 (1989), *reprinted in* 1989 U.S.C.C.A.N.1906, 1948 (explaining that the Committee has often considered amending section 502 of ERISA to encompass additional remedies but has concluded that such legislative action is "unnecessary" because "the legislative history of ERISA ... support[s] the view that Congress intended for the courts to develop a Federal common law with respect to employee benefit plans, including the development of appropriate remedies, even if they are not specifically enumerated in section 502").

Court, however, has long demonstrated an "unwillingness to infer causes of action in the ERISA context." [54] This Court can neither simply disregard its sworn oath to comply with the opinions of the Supreme Court, nor can it "legislate by judicial decree nor apply a statute, such as ERISA, other than as drafted by Congress." [55] Thus, the task of reforming ERISA "so that it may continue to serve its noble purpose of safeguarding the interests of employees" falls squarely upon the shoulders of Congress.[56]

## THE LARGER ISSUES

Perhaps even more disturbing than the perverse outcome generated by ERISA in this particular case is the fact that, in the current health care system, the misconduct alleged by Diane Andrews–Clarke may not be atypical. As discussed above, 75% of insured Americans now receive their health care through some type of "managed care" plan. Although the advent of managed care has eliminated many of the excesses that plagued the traditional fee-for-service system and has, at least temporarily, stabilized the growth of health care costs,[57] it has also spawned a whole new set of potential abuses. In contrast to the old system, in which doctors had incentives to provide too much care, under managed care, the incentives are to provide as little treatment as possible. Indeed, there is a growing body of anecdotal evidence that managed care plans often deny necessary, and even life-saving medical treatment in the name of cutting costs.[58]

**54.** *Mertens*, 508 U.S. at 254, 113 S.Ct. at 2067 (citing *Massachusetts Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 [1985] ); *see also Turner*, 127 F.3d at 200 ("[W]hether or not Congress ever thought about the impact on health care in particular when it wrote ERISA's remedies and preemption provisions, Congress is well equipped to revisit the issue and alter the statutory language that now stands at bar.").

Moreover, in *Mertens*, the Supreme Court held that a claim for compensatory of consequential damages does not fall under the purview of "other equitable relief" available to an ERISA plan participant or beneficiary under section 502(a)(3). In rejecting the plaintiff's argument that courts should give a "strained" construction to the term "other equitable relief" in order to achieve "the purpose of ERISA to protect plan participants and beneficiaries," the *Mertens* court noted that "vague notions of a statute's 'basic purpose' are [ ] inadequate to overcome the words of its text regarding the specific issue under consideration." *Mertens*, 508 U.S. at 261, 113 S.Ct. at 2071.

**55.** *Turner*, 953 F.Supp. at 424.

**56.** *Corcoran*, 965 F.2d at 1338–39.

**57.** Miller, *Managed Care Savings Noted*, at E3; Thomas W. Malone & Deborah Haas Thaler, *Managed Health Care: A Plaintiff's Perspective* 32 Tort & Ins. L.J. 123, 153 (1996) (citing a report prepared by KPMG Peat Marwick indicating that in 1995, the rate of increase in health care premiums slowed to 2.1%, down significantly from a 10.9% increase in 1992).

These cost savings may only be temporary, however. *See* Richard A. Knox, *Health Care Inflation Likely to Accelerate, Report Predicts,* Boston Globe, Apr. 10, 1997, at A28 (medical costs likely to rise more than twice as fast as general inflation over the next five years); Alex Pham,

*HMOs Facing Unexpected Costs Surge*, Boston Globe, Aug. 2, 1996, at A1. *But see* Louise Kertesz, *But Managed–Care Savings Will Grow— Study*, Mod. Healthcare, June 9, 1997, at 8 (study commissioned by the American Association of Health Plans indicates that savings achieved by managed care plans will grow through the year 2000).

Moreover, there is reason to question what percentage of the cost savings generated by managed care are being passed on to consumers. Malone & Thaler, *Managed Health Care*, 32 Tort & Ins. L.J. at 124 (noting that "executives of managed care plans are reaping many of the benefits"); George Anders, *Health Against Wealth: HMOs and the Breakdown of Medical Trust* 60–65 (1996) (same).

**58.** *See, e.g.,* Rutter, *Democratizing HMO Regulation*, 30 U. Mich. J.L. Reform, at 147–49 (describing several HMO "horror stories" about denials of necessary medical treatment that have "badly shaken" public confidence in managed care); Anders, *Health Against Wealth* at 244 ("Parts of the [managed care] industry operate under their own versions of Gresham's law, in which bad plans drive out the good. Cost cutting predominates, even if it means denying care and trying to keep sick people off membership rolls."); Kilborn, *Trend Toward Managed Care is Unpopular, Surveys Find*, at A25 (survey published by Louis Harris and Associates indicates that 54 percent of Americans "believe[ ] the trend toward managed care is harmful for them"); Alan A. Stone, Editorial, *A Medical Emergency: AMA's Opposition to Assisted Suicide is Spurred by Market–Driven Realities*, Boston Globe, June 27, 1997, at A19 ("[T]he system is being driven by market forces into a 'race to the bottom'...."); Doris Sue Wong, *Legislative Panels Back Shift of Power from Managed Care*, Boston Globe, June 25, 1997, at A22 (quoting Massachu-

Congress, the states, and even the health care industry have recognized the need for reform.[59] In 1997 alone, state legislatures across the country have introduced approximately 1,000 bills regulating managed care, 182 of which have already been enacted into law.[60] At both the federal and state levels, considerable emphasis has been placed on legislating quality standards for individual treatments and procedures. In response to public outcry concerning "drive-through deliveries," Congress enacted the Newborns' and Mothers' Health Care Protection Act of 1996[61] which requires all health plans to provide coverage for a minimum hospital stay of 48 hours after childbirth.[62] In addition, Congress is presently considering bills that would force health plans to provide coverage for 1) certain emergency medical services,[63] 2) minimum hospital stays for mastectomies and lumpectomies,[64] 3) reconstructive breast surgery,[65] 4) annual mammography screenings for women over the age of 40;[66] and 5) gynecological services.[67] Numerous states have already passed or are considering legislation similar to some or all of these proposals.[68]

setts state Senator Mark Montigny) ("while managed care was meant to cure the excesses of the old fee-for-service system, some plans have developed into 'sophisticated money management networks' that are squeezing patients out of health care and causing some patients to be 'lost prematurely' ").

These abuses may be especially pronounced in the context of mental health and substance abuse treatment. *See, e.g.,* Anders, *Health Against Wealth,* at 150–70; Sandra G. Boodman, *Managed Care Comes to Mental Health: Are Patients Getting What They Need?,* Wash. Post, May 6, 1997, at Z12 ("As enrollment in managed behavioral health plans has mushroomed, so have complaints by mental health advocates, patients, and their relatives, who say that quality care has been sacrificed for short-term profits."); *Abusing the Abuser: N.Y. Report Slams Managed Care's Record,* Alcoholism & Drug Abuse Wkly, July 22, 1996, at 1 (finding that insurers frequently and unjustifiably deny authorization for inpatient substance abuse patients, even when such treatment is court-mandated); Elizabeth Gleick, et al., *Rehab Centers Run Dry Kicking the Habit of 30–day Inpatient Treatment; Substance–Abuse Clinics Retool for Managed Care,* Time, Feb. 5, 1996, at 44 (quoting Betty Ford Center president John Schwarzlose) ("[I]ncreasingly, the insurer's response to continuing inpatient addiction treatment is to 'just say no.' "); Connie Paige, *Mental Health Advocates Link Abuse, Suicides to Managed Care,* Boston Herald, Jan. 19, 1996, at 7; Doris Sue Wong, *Groups Push for Better Mental Coverage,* Boston Globe, Apr. 9, 1997, at B2.

**59.** Rutter, *Democratizing HMO Regulation,* 30 U. Mich. J.L. Reform at 149, 162 Alex Pham, *HMOs Unveil Reform Package; Patient Advocates Attack it for Lacking Enforcement* Power, Boston Globe, Apr. 8, 1997, at D1.

**60.** Milt Freudenheim, *Pioneering State for Managed Care Considers Change,* N.Y. Times, July 14, 1997, at A1. It is not yet known, of course, how many of these measures will founder on the rock of ERISA preemption.

**61.** Pub.L. No. 104–204, 110 Stat. 2935 (1996).

**62.** 29 U.S.C. § 1185.

**63.** Access to Emergency Medical Services Act of 1997, S. 356, H.R. 815, 105th Cong. (1997).

**64.** Breast Cancer Patient Protection Act of 1997, S. 143, H.R. 135, H.R. 616, 105th Cong. (1997).

**65.** Reconstructive Breast Surgery Benefits Act of 1997, H.R. 164, S. 609, 105th Cong. (1997).

**66.** Mammogram Availability Act of 1997, H.R. 617, S. 727, 105th Cong. (1997).

**67.** Access to Women's Health Care Act of 1997, H.R. 1737, S. 373, 105th Cong. (1997).

**68.** *See* Freudenheim, *Pioneering State For Managed Care Considers Change,* at D8; Carol Jouzaitis, *States Crack Down on HMOs' Abuse of Power: Laws Give Decisions Back to Physicians,* Chi. Trib., Apr. 15, 1996, at 1. The Massachusetts legislature, for example, is presently considering, *inter alia,* bills that would require health insurance plans 1) that provide medical and surgical benefits to cover a minimum of 48 hours of inpatient care following a mastectomy and a minimum of 24 hours of inpatient care following a lumpectomy, *see* H.B. 3835, S.B. 679, Massachusetts 181st General Court (1997); 2) that cover mastectomies to also provide coverage for breast reconstruction surgery, *see* S.B. 665, Massachusetts 181st General Court (1997); and 3) to cover certain emergency medical services, *see* H.B. 2702, Massachusetts 181st General Court (1997).

ERISA's "savings clause," 29 U.S.C. § 1144(b)(2)(A), excludes from ERISA preemption any state law which regulates insurance. Accordingly, state statutes requiring all insurance policies, including those purchased by ERISA plans, to provide certain minimum benefits, are not preempted by ERISA. ERISA's "deemer clause," 29 U.S.C. § 1144(b)(2)(B), however, provides that an employee benefit plan does not constitute an insurer for purposes of the savings clause. An ERISA plan may therefore

As matter of public policy, such piecemeal reforms are inadequate because they target the symptoms while ignoring the underlying pathology—the incentives for undercare which now pervade America's health care system. Persons who suffer from medical conditions that affect only a small or historically underrepresented portion of the population are left unprotected.[69] Furthermore, although certain procedures such as mastectomy and child birth seem to lend themselves to uniform regulation, innumerable other medical conditions require more idiosyncratic treatment protocols. Attempts to draw bright-line rules regarding what levels of treatment are "medically necessary" for such conditions will ultimately "impede even proper denials" of treatment, and thus needlessly drive up health care costs.[70]

Rather than seeking directly to regulate managed care procedure-by-procedure, the more efficient approach is to allow insurers and utilization review providers to make benefit determinations on a case-by-case basis, **but** hold them legally accountable for the

opt out of the these state regulations by self-insuring rather than purchasing insurance. *Metropolitan Life Ins. Co.*, 471 U.S. at 747, 105 S.Ct. at 2392–93; *see also* Rutter, *Democratizing HMO Regulations*, 30 U. Mich. J.L. Reform at 188 (noting that state "mandated benefits" laws "create a powerful incentive for businesses to cancel their HMO contracts and self-fund their employee health plans instead"). Recent studies indicate that *over 65% of employers self-insure.* Troy Paredes, *Stop–Loss Insurance, State Regulation, and ERISA: Defining the Scope of Federal Preemption*, 34 Harv. J. on Legis. 233, 234 (1997). As early as 1993, this Court noted the dramatic shift to industry self-insurance as a means to avoid state insurance regulation. *Pariseau*, 822 F.Supp. at 846 n. 5 ("[W]hatever Congress may have originally intended . . ., entrepreneurial choice has significantly reduced the class of workers for whom the benefits of state insurance regulation are available. Today, while ERISA blankets the benefit plan landscape, its advantages have come at the cost of state insurance regulation for those who might heretofore have benefitted from such consumer oriented concerns."). Thus, only Congress has the authority to require all ERISA plans, including those that self-insure, to furnish particular benefits.

There are several ways that an employer may structure an employee welfare benefit plan:
For example, an employer may fully self-insure, or self-fund, its plan either by setting aside funds to satisfy potential claims against the plan or by simply paying benefits to plan participants out of the company's general accounts. In either case, the employer-sponsor retains the risk of providing health care. Alternatively, an employer may fully insure its plan by purchasing health and accident insurance on behalf of plan participants from a third-party insurer. Employers, however, are increasingly turning to a third option, which combines features of both models just described. Under this third option, referred to as a "stop-loss plan," an employer self-funds but purchases a form of reinsurance known as stop-loss insurance to insure itself against the risk that claims against its plan will exceed a certain specified level.

Over the last decade, employers have increasingly chosen to self-fund their welfare plans. The most recent studies indicate that over 65% of employers self-insure, and that about half of the nation's workforce is covered under a self-insured plan. In 1992, nearly 90% of Fortune 500 companies and 78% of employers with 1000 or more employees self-funded their welfare plans.
When employers self-fund, however, they expose themselves to a substantial risk of loss. As a result, few employers today fully self-fund their welfare plans. Instead, even employers that choose not to purchase basic health and accident insurance on behalf of their participants usually purchase stop-loss insurance to limit their exposure to risk and consequent liability. The most recent data show that over 70% of otherwise self-funded plans are covered by some form of stop-loss insurance. Indeed 96% of employers with fewer than 1000 employees purchase stop-loss protection. Not only is the number of plans with stop-loss coverage substantial, but that number is increasing.
[As discussed above], ERISA creates a distinction between fully insured plans and fully self-funded plans for federal preemption of state regulation governing welfare plans, ERISA preempts states from regulating fully self-funded plans but permits states to regulate fully insured plans indirectly by regulating their insurer.
Paredes, *Stop–Loss Insurance, State Regulation, and ERISA*, 34 Harv. J. on Legis. at 234–35 (footnotes omitted). The question of whether ERISA also permits states to regulate a stop-loss plan's stop-loss insurer has yet to be answered by the courts. *See id.* at 235.    •

**69.** Cf. Boodman, *Managed Care Comes to Mental Health*, at Z12 ("[U]nlike the controversies over outpatient mastectomies and 24–hour maternity stays known as 'drive-through' deliveries, which attracted the attention of President Clinton and Congress, the sea change in mental health care has occurred virtually without public comment.").

**70.** Rutter, *Democratizing HMO Regulation*, 30 U. Mich. J.L. Reform, at 154, 186–89.

consequences of their decisions.[71] By ensuring that bad medical judgments made during the utilization review process do not "end up being cost-free to the plans that rely on [utilization review] to contain medical costs," plan administrators will have more incentive to "seek out those [utilization review providers] that can deliver both high quality services and reasonable prices."[72]

Some have argued that exposing managed care plans to the threat of direct liability will result in over-deterrence, and therefore undermine legitimate cost containment efforts.[73] Congress, certainly sensitive to these concerns, of course has the power to cap the amount of damages that beneficiaries can recover against insurers and utilization providers, or to take other steps to limit industry liability. Under any criterion, however, the shield of near absolute immunity now provided by ERISA simply cannot be justified.[74]

**71.** *See* Anders, *Health Against* Wealth, at 255–56 (holding HMO's accountable for their mistakes is a vital component of systematic health care reform); Rutter, *Democratizing HMO Regulation,* 30 U. Mich. J.L. Reform at 169 ("The threat of litigation . . . may be the most effective deterrent of improper care denials currently available to enrollees."); *Cf.* Patricia M. Danzon, *Tort Liability: A Minefield for Managed* Care?, 26 J. Legal Stud. 491, 517–18 (1997) ("Efficiency and equity argue for eliminating the inconsistencies between liability exposure of ERISA-protected plans and non-ERISA plans. . . . [T]he preferred approach would be to hold all health plans liable under contract for denial of coverage consistent with the contract.").

**72.** *Corcoran,* 965 F.2d at 1338; *see also* Jack K. Kilcullen, *Groping for the Reins: ERISA, HMO Malpractice, and Enterprise Liability,* 22 Am. J.L. & Med. 7, 49 (1996) ("[T]he cost of safety should be internalized to the plan and not, as under ERISA, externalized to the injured patient."); Jeanne Kassler M.D., *Bitter Medicine: Greed and Chaos in American Health* Care 88–92 (1994) (due to the lack of accountability in the current system, utilization review "firms make their money by cutting insurers' expenses, 'appropriately or otherwise'").

This Court notes that, even without the threat of liability, market forces do provide *some* incentive for managed care plans to provide quality care. The efficacy of such quality-based competition is limited, however, because it is "notoriously difficult for medical consumers to estimate the quality of care." Latham, *Regulation of Managed Care Incentive Payments,* 22 Am. J.L. & Med. at 412. "Although there is a great deal of effort being devoted to the development of objective measures of quality of care, this work is still in its clinical infancy." *Id.*

This problem is exacerbated by the fact that 70% of all medical costs are incurred by only 10% of the general population. Kassler, *Bitter Medicine* at 29. Since the tangible effects of improper denials of care are felt most strongly by such a small minority of the enrollees, managed care plans are "tempted to compete for customers primarily by offering them the [immediately] tangible benefit of lower plan costs rather than by depending on customers to recognize high quality." Latham, *Regulation of Managed Care*

*Incentive Payments,* 22 Am. J.L. & Med. at 412; *see* also Rutter, *Democratizing HMO Regulation,* 30 U. Mich. J.L. Reform, at 148–49 (noting that the "same HMO that eagerly provides cheap prescription drugs and brochures on cardiovascular health may deny expensive but vital care to its patients when they are sickest and most vulnerable").

**73.** *See, e.g.,* Rutter, *Democratizing HMO Regulation,* 30 U. Mich. J.L. Reform at 172; Latham, *Regulation of Managed Care Incentive Payments,* 22 Am. J.L. & Med. at 413–14.

**74.** *Cf. Wilson v. Blue Cross of Southern California,* 222 Cal.App.3d 660, 672–73, 271 Cal.Rptr. 876 (1990) (in case involving a non-ERISA plan, the court held that public policy considerations which favor the use of cost containment strategies such as utilization review are insufficient to justify immunizing insurers and utilization review providers from normal tort liability rules).

A further cost of this near absolute immunity is its pernicious effect on our democratic system. Whenever Congress extinguishes a right which heretofore has been vindicated in the courts through citizen juries, there is a cost. It is not a monetary cost. It is a cost paid in rarer coin— the treasure of democracy self. *See* Christopher J. Peters, *Adjudication as Representation,* 97 Col. L.Rev. 312 (1997) (discussing how the processes of our court system vindicate and strengthen democracy by involving litigants with standing in the explication and application of our laws). For further discussion on the critical role of the jury in our democratic society, see *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 994, 1005–06 (D.Mass.1989); *Developments in the Law: The Civil Jury,* 110 Harv. L.Rev. 1408, 1433 (1997) (footnotes omitted).

Finally, this Court notes that the immunity currently afforded to insurers and utilization review providers unfairly leaves doctors, "quite literally, caught in the middle in the battle over treatment between patients and the HMOs." Rebuen, *In Pursuit of Health,* 82–Oct. A.B.A. J. at 58. Doctors who complain too vigorously about denials of care by the managed care plan face the risk of being kicked out of the plan's network of approved providers. *Id.* at 60. Yet, thanks to

This Court takes judicial notice[75] that Congress is now considering two bills which would remove the shield of de facto immunity that ERISA provides for managed care insurers and utilization review providers. The Managed Care Plan Accountability Act of 1997 would amend ERISA's civil enforcement provision, 29 U.S.C. § 1132(c), to provide a federal remedy to any ERISA plan participant or beneficiary who is wrongfully denied benefits under a managed care plan pursuant to a "clinically or medically inappropriate decision or determination resulting from the application of any cost containment technique ... [or] any utilization review directed at cost containment."[76] The Patient Access to Responsible Care Act of 1997, in contrast, would make ERISA's preemption provision, section 514(a), inapplicable to "any State cause of action to recover damages for personal injury or wrongful death against any person that provides insurance or admin-

istrative services to or for an employee welfare benefit plan maintained to provide health care benefits."[77] Although both of these bills are still in the early stages of the legislative process, Congress is at least aware of the current gap in remedies.[78]

The very reason that most "people seek health insurance is to have some medical security in a crisis."[79] For the more than 50% of American workers who receive their health insurance through an ERISA-governed plan,[80] however, such security is sorely lacking because of the *de facto* immunity that the law now confers upon insurers and utilization review providers associated with such plans. Unfortunately, to date, "ERISA [has proven] an excellent example of the classic observation that it is a great deal more difficult for Congress to correct flawed statutes than it is to enact them in the first place

ERISA, when a treating physician makes a decision to discharge a patient because an insurance company refuses to pay benefits, the patient's sole recourse is against the physician, and insurers are quick to abandon him to litigation. *See* Barry R. Furrow, *Litigation Over Quality in Managed Care: Individual Malpractice/Negligence Claims in Arbitration and Litigation*, 1, 13 (1995). Indeed, when asked what remedy was left to Diane Andrews–Clarke, the insurer's lawyer said, "Sue the providers," (i.e., the doctors and hospitals—but not us). Motion hearing transcript, Mar. 26, 1997. This result contravenes fundamental principles of joint tort liability. *See Wickline*, 192 Cal.App.3d at 1645, 239 Cal.Rptr. 810 (emphasis added) ("The patient who requires treatment and who is harmed when care which should have been provided is not provided should recover for the injuries suffered from **all** those responsible for the deprivation of such care, including, when appropriate, health care payers.").

75.  ed. R. Evid. 201.

76.  H.R. 1749, 105th Cong. § 2(a) (1997). The proposed amendment would allow the participant or beneficiary to recover any actual damages caused by the wrongful denial of benefits, including compensatory and consequential damages, with each specified defendant to be held jointly and severally liable, and would also grant courts the discretion to award punitive damages. H.R. 1749, 105th Cong. § 2(a) (1997).

77.  S. 644, H.R. 1415, 105th Cong. (1997). By deferring to the states to define the proper scope of liability for insurers and utilization review providers, the latter proposal potentially would

subject ERISA plans to the cost of compliance with conflicting standards of care.

This Court takes judicial notice of still another bill now before Congress which would require plans to establish an expedited appeals process for benefit determinations made during the course of utilization review, with the possibility of further external appeals to an independent review organization certified under state law. Health Insurance Bill of Rights Act of 1997, S. 373, 105th Cong. § 2785 (1997). Unlike the other bills discussed herein, however, this proposal would not afford an adequate remedy to persons who, due to time constraints (even with the expedited process in place) or incapacity brought on by illness, are unable to take advantage of such grievance procedures. Congress might, however, find it desirable to combine the two forms of legislation.

78.  Such legislation faces an uphill battle, however. *See* Anders, *Health Against Wealth*, at 210–226 (characterizing the managed care industry as having the "best lobbyists in America" and describing how these lobbyists have managed to defeat managed care reform proposals that seemed to enjoy widespread support amongst patient advocates and physicians); Fisk, *The Last Article about the Language of ERISA Preemption?*, 33 Harv. J. on Legis. at 99 (noting that, particularly at the federal level, "significant health care reform may be blocked ... by a well-organized and well-financed business and insurance lobby").

79.  Anders, *Health Against Wealth* at 15.

80.  Kilcullen, *Groping for the Reins*, 22 Am. J.L. & Med. at 9.

....because interests coalesce around the advantageous aspects of the status quo." [81] Although the alleged conduct of Travelers and Greenspring in this case is extraordinarily troubling, even more disturbing to this Court is the failure of Congress to amend a statute that, due to the changing realities of the modern health care system, has gone conspicuously awry from its original intent.

Does anyone care?

Do you?

---

81. Fisk, *The Last Article About the Language of ERISA Preemption?*, 33 Harv. J. on Legis. at 99 (1996) (citing Guido Calabresi, *A Common Law for the Age of Statute* 6 (1982)).