BECKER, Circuit Judge,
concurring.
I am satisfied that Judge Rendell’s opinion reaches the correct result under our governing caselaw. While I thus join in her opinion and in the judgment, I write separately to add my voice to the rising judicial chorus urging that Congress and the Supreme Court revisit what is an unjust and increasingly tangled ERISA regime.
Congress enacted ERISA in 1974 “to promote the interest of employees and their beneficiaries in employee benefit plans.” Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (surveying Congressional statements of purpose). However, with the rise of managed care and the Supreme Court’s series of decisions holding preempted any action for damages against HMOs, ERISA has evolved into a shield that insulates HMOs from liability for even the most egregious acts of dereliction committed against plan beneficiaries, a state of affairs that I view as directly contrary to the intent of Congress. Indeed, existing ERISA jurisprudence creates a monetary *454 incentive for HMOs to mistreat those beneficiaries, who are often in the throes of medical crises and entirely unable to assert what meager rights they possess.
Lower courts have struggled to maintain some semblance of equity notwithstanding the enormous breadth of the preemption test, one that turns on whether the claim is “related to” a benefit plan, inter alia, by identifying exceptions to § 514 preemption, such as that for medical malpractice liability. And in terms of the remedial scope of § 502, they have struggled to make sense out of the distinction between eligibility decisions (which are preempted) and medical decisions (which are not), a hopeless endeavor, as I shall explain. Unfortunately, the price of all this has been descent into a Serbonian bog[1] wherein judges are forced to don logical blinders and split the linguistic atom to decide even the most routine cases.
I.
A.
ERISA was enacted in 1974 to address the increasingly-apparent insecurity of workers’ vested pension funds, a problem that gained national recognition through such notorious events as the Studebaker plant shutdown in 1963, which caused approximately 4,400 workers to lose their pensions. See generally Michael S. Gordon, Overview: Why Was ERISA Enacted?, U.S. Senate, Special Comm, on Aging, The Employee Retirement Income Security Act of 1974: The First Decade 6-25 (Information Paper) (1984). Prior to ERISA, workers were entitled only to the assets in the pension plan or to nominal pension benefits, whichever was lower; of course, it was entirely possible for a plan to have zero assets, as happened with some frequency when firms closed shop. ERISA contained a raft of provisions designed to protect plan participants against negligent or malfeasant plan managers. For example, it created the Pension Benefit Guarantee Corporation (“PBGC”), an insurer akin to the Federal Deposit Insurance Corporation, to protect against employer insolvency.
The “benefit plans” in need of protection, however, were of two distinct types - pension and welfare - and substantially different policy concerns animated Congress’s reform in each area. Pension plans, to which employees contribute over the course of their careers and rely upon to provide retirement income, were thought to present far greater opportunity for mismanagement and underfunding. Unlike welfare benefit plans, pension plans accrue substantial funds that must be invested with prudence, and they must be able to survive continuously changing circumstances. Title 1 of ERISA therefore imposed on pension plan managers comprehensive reporting, disclosure, vesting, minimum funding, and fiduciary duty requirements.
Welfare benefit plans, which include medical, surgical, sickness, accident, disability, death, unemployment, and similar programs, posed a very different set of challenges. Unlike pension plans, welfare benefit plans operate on a “pay as you go” basis, and generally do not entail long- *455 term financial commitments. See John H. Langbein and Bruce A. Wolk, Pension and Employee Benefit Law at 176 (3d ed.2000). ERISA’s framers therefore saw no need to impose vesting requirements on such plans. Similarly, minimum funding requirements are intended to guard against plan default by the plan sponsor on its long-term commitments to plan beneficiaries, a minor concern where no substantial funds accrue. The framers thus exempted welfare benefit plans from ERISA’s funding requirements as well.
The result is that welfare benefit plans are far less regulated than pension plans. They are subject to ERISA’s reporting, disclosure, fiduciary, and remedial rules - those that govern procedure - but exempt from the substantive vesting and funding requirements, which are meant to guarantee a certain level of expected benefits. Congress’s relative lack of concern -with substantive regulation of welfare plans is clear from the Supreme Court’s statement that “ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits.” Shaw, 463 U.S. at 91, 103 S.Ct. 2890. Indeed, courts have held that the absence of a vesting provision allows employers to amend their plans virtually at will, even in discriminatory fashion. See, e.g., Confer v. Custom Engine Co., 952 F.2d 41, 43 (3d Cir.1991) (noting a plan sponsor may change benefits prospectively by formal written notice); McGann v. H & H Music Co., 946 F.2d 401 (5th Cir.1991) (upholding an employer’s amendment of its plan to exclude coverage for AIDS treatment).
Despite ERISA’s relatively fight regulation of welfare benefit plans, it is clear that the legislation provided substantially greater safeguards for both pension and welfare plan beneficiaries than had previously existed. But ERISA also contained a crucial concession to plan sponsors in the form of § 514(a), an express preemption provision mandating that Titles I and IV of ERISA, which impose the regulations discussed above, “shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.” Although this section is subject to an important exception that allows states to impose laws regulating insurance, see § 514(b)(2)(A), its breadth is striking. The Supreme Court explains that Congress intended
to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.
Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). This view is premised on the statement of Rep. John Dent, a sponsor of the Act in the House of Representatives, who declared that its purpose was to “efiminat[e] the threat of conflicting and inconsistent State and local regulation.” 120 Cong. Reg. 29197 (1974).
B.
In a meaningful sense, Congress’s decision to federalize pension and employee benefit law appear to have assisted plan beneficiaries as much as plan sponsors. No employer is required to offer a pension or welfare benefit plan to its employees, and were Congress to have established ERISA’s regulations as merely a federal baseline and allowed states to supplement it as they saw fit, i.e., had ERISA not *456 preempted state law, some employers might have declined to offer such plans rather than deal with the compliance costs of tailoring them to individual jurisdictions. At a minimum, it is likely that any compliance costs would have been reflected in a lower level of benefits for plan participants, which of course would undermine the purpose of ERISA. From an ex ante perspective, therefore, it might have been reasonable to view even § 514(a) as furthering the interests of plan beneficiaries.
In practice, however, nothing has been further from the truth - ERISA generally, and § 514(a) particularly, have become virtually impenetrable shields that insulate plan sponsors from any meaningful liability for negligent or malfeasant acts committed against plan beneficiaries in all too many cases. This has unfolded in a line of Supreme Court cases that have created a “regulatory vacuum” in which virtually all state law remedies are preempted but very few federal substitutes are provided. In these cases, which began with Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Court initially employed textualist interpretations of § 514(a) to give ERISA a staggeringly broad preemptive scope. Al-essi itself was a relatively straightforward case in which a unanimous Court held preempted a New Jersey law that eliminated one method for calculating pension benefits, reasoning that, whatever the law’s purpose, it clearly related to pension plans. Id. at 524, 101 S.Ct. 1895. Although Alessi itself was innocuous enough, it established a precedent of determining ERISA’s preemptive scope by searching the phrase “relates to” for concrete meaning, an approach that would eventually be chimerical.
In Shaw v. Delta Air Lines, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), another unanimous decision, two New York statutes required health and disability plans to treat pregnancy the same as other nonoccupational disabilities at a time when federal employment discrimination statutes did not. In a landmark passage, the Court stated:
We have no difficulty in concluding that the [New York laws] “relate to” employee benefit plans. The breadth of § 514(a)’s pre-emptive reach is apparent from that section’s language. A law “relates to” an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.
Id. at 96-97, 103 S.Ct. 2890 (emphasis added). Although the Court left the door ajar by cautioning that “[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law ‘relates to’ the plan,” id. at 100, n. 21, 103 S.Ct. 2890, the “connection with or reference to” language became the test for future cases.
The Court applied the passage in unanimous holdings in Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (holding that a state statute mandating mental health coverage in group health insurance policies fell within § 514(a)’s preemptive scope, but was saved by ERISA’s insurance exception), and Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding preempted a state cause of action against an insurer for bad-faith denial of a claim). By the mid-1990s, however, it had become clear that the “relates to” standard was one without conceptual limits, and given the Court’s general “assumption that the historic police powers of the States were not to be superseded by the Federal Act unless tb was the clear and manifest purpose of Congress,” Rice v. Santa Fe Elevator *457 Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), it balked at the specter of a preemptive vortex that could swallow virtually any state remedial law. It abruptly reversed course in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), where it unanimously noted that, “[i]f ‘relate to’ were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere.” Id. at 655, 115 S.Ct. 1671 (internal citation omitted). It recognized that it “simply must go beyond the unhelpful text ... and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.” Id. at 656, 115 S.Ct. 1671.
C.
As discussed above, Congress’s intent behind § 514(a) preemption was to ensure that plan sponsors would be subject to uniform law. See Ingersoll-Rand, 498 U.S. at 142, 111 S.Ct. 478. One critical aspect of this uniformity concerns § 502, ERISA’s civil enforcement provision. In Pilot Life, the Court concluded that Congress intended the remedies in § 502 to be the exclusive remedies for violations of rights guaranteed under ERISA. It explained that “the pre-emptive force of § 502(a) was modeled on the exclusive remedy provided by § 301 of the Labor Management Relations Act.... Congress was well aware that the powerful preemptive force of § 401 of the LMRA displaced” all state law claims, “even when the state action purported to authorize a remedy unavailable under the federal provision.” 481 U.S. at 52, 53, 107 S.Ct. 1549. In other words, § 514(a) preempts state causes of action to enforce ERISA-guaran-teed rights even when § 502 provides no substitute federal cause of action. This “regulatory vacuum” creates situations in which plan beneficiaries have little or no recourse for even the most egregious violations of their rights, for the remedies contained in § 502 are incapable of making victims whole; indeed, in many cases they actually create incentives for HMOs to mistreat their plan participants.
Section 502 contains two subsections that address a participant’s right to recover for wrongs committed against the participant personally (as opposed to those committed against the plan itself, which are considered violations of the sponsor’s fiduciary duty). The first, § 502(a)(1)(B), authorizes the participant or beneficiary to bring a civil action “to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.” It is through this provision that DiFelice might have sought an injunction to compel Aetna to cover the specialized tracheosto-my tube. The second, § 502(a)(3), authorizes a participant, beneficiary, or fiduciary to seek equitable remedies - injunctive relief against “any act or practice which violates” ERISA or the plan terms, or “other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions” of ERISA or the plan.
Although these provisions seem comprehensive at first glance - they allow recovery of “benefits due” and empower a participant to “enforce his rights” and seek “appropriate equitable relief’ - they in fact operate to leave participants almost completely at the mercy of HMOs. The first section, 502(a)(1)(B), by its plain language only allows plan participants to seek the benefits to which they are contractually entitled, even when those benefits have been denied in bad faith and despite the *458 fact that the participants most in need of this section are often the ones least able to take advantage of it. A plan participant whose claim is denied by an HMO’s utilization review board - Mr. DiFelice, for example, see infra - is often in the throes of a life-or-death medical crisis, hardly a feasible time to retain counsel and prosecute an injunctive lawsuit. The costs of such suits are likely to be immense, and ERISA provides for attorney fees, if at all, only after the action concludes. See § 502(g)(1). Even if a participant ultimately prevails against his insurer, it will frequently be the participant’s estate that reaps the meager reward.
In many areas of law contingency fee structures are used to overcome a litigant’s initial impecuniosity. But any possibility of using contingency fees in this context is undermined by ERISA preemption, for a string of Supreme Court cases has interpreted ERISA to disallow any recovery of compensatory or punitive damages. See Langbein & Wolk, Pension and Employee Benefit Law at 770-75. In Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the plaintiff sued under § 502(a)(2), alleging that the improper processing of her benefit claim exacerbated her condition and entitled her to compensatory and punitive damages under § 409(a), which, inter alia, authorizes “such ... equitable or remedial relief as the court may deem appropriate.” The Court, however, concluded that any recovery under § 409 must inure to the plan rather than the beneficiary. The Court then explained in dictum that § 502(a)(1)(B), the analogous section allowing for a participant’s recovery, says “nothing about the recovery of extra-contractual damages.” Id. at 144, 105 S.Ct. 3085. In an oft-cited passage, it explained.
The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted [ ] provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent admission is rendered especially suspect upon close consideration of ERISA’s interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a comprehensive and reticulated statute.
Id. at 146, 105 S.Ct. 3085 (internal citation omitted).
Although Russell’s narrow holding left open the possibility that extracontractual damages are recoverable under § 502(a)(3)’s “appropriate equitable relief’ provision, the Court’s subsequent decision in Mertens v. Hewitt Associates, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), foreclosed any such hopes. In Mertens, participants sued the fiduciaries of a failed plan, alleging breach of fiduciary duty and seeking monetary relief, which they characterized as equitable. Petitioners argued that, “[a]lthough a beneficiary’s action to recover losses resulting from a breach of duty superficially resembles an action at law for damages, ... such relief traditionally has been obtained in the courts of equity and therefore is, by definition, equitable relief.” Id. at 255-56, 113 S.Ct. 2063.
The Supreme Court acknowledged that ERISA’s roots lie in the common law of trusts, see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-11, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), that courts of equity had jurisdiction over trust law, and that monetary damages were available in those courts against the trustee. It concluded, however, that “[s]ince all relief available for breach of trust could be obtained from a court of equity, limiting the sort of relief available under § 502(a)(3) to ‘equitable *459 relief in the sense of “whatever relief a common-law court of equity could provide in such a case’ would limit the relief not at all.” Mertens, 508 U.S. at 257, 113 S.Ct. 2063. Put another way, interpreting “equitable relief’ to mean “any relief’ would render superfluous the word “equitable.” The Court’s solution was to interpret “equitable” as referring to types of relief traditionally available in pre-merger courts of equity, that is, injunctions, mandamus, and restitution, but not monetary damages.
The unavailability of extracontractual damages has effects that are perverse. First, as stated above, contingency fees are rendered entirely impractical - precious few lawyers would be willing to undertake a horrendously complex case of uncertain outcome when the greatest potential reward is merely provision of the care that had been contractually promised. Without contingency fees, participants in the midst of medical crises are completely at the mercy of HMOs unless they are fortunate enough to have the financial means to bring a suit for an injunction, a circumstance which is no doubt exceptional. Although it might seem a simple matter to seek an injunction compelling contractually-guaranteed coverage of a procedure, nothing is further from the truth where - as with Mr. DiFelice - the contractual availability of coverage hinges on a highly fact-intensive determination of medical necessity involving accepted standards of care and tolerable levels of risk for the participant’s malady. To the extent that participants are unable to seek an injunction compelling coverage, ERISA’s remedial scheme is almost entirely illusory.
The second perverse effect is that, at the same time as ERISA makes it inordinately difficult to bring an injunction to enforce a participant’s rights, it creates strong incentives for HMOs to deny claims in bad faith or otherwise “stiff’ participants. ERISA preempts the state tort of bad-faith claim denial, see Pilot Life, 481 U.S. at 54-56, 107 S.Ct. 1549, so that if an HMO wrongly denies a participant’s claim even in bad faith, the greatest cost it could face is being compelled to cover the procedure, the very cost it would have faced had it acted in good faith. Any rational HMO will recognize that if it acts in good faith, it will pay for far more procedures than if it acts otherwise, and punitive damages, which might otherwise guard against such profiteering, are no obstacle at all. Not only is there an incentive for an HMO to deny any particular claim, but to the extent that this practice becomes widespread, it creates a “race to the bottom” in which, all else being equal, the most profitable HMOs will be those that deny claims most frequently.
In sum, ERISA’s remedial scheme gives HMOs every incentive to act in their own and not in their beneficiaries best interest while simultaneously making it incredibly difficult for plan participants to pursue what meager remedies they possess, a confounding result for a statute whose original purpose was to protect employees.
II
A.
Given that ERISA’s remedial scheme often provides no remedies, litigants have gone to great lengths to identify state causes of action that are not preempted by ERISA, and courts have generally been sympathetic to their efforts even when ultimately finding their claims preempted. For example, in Andrews-Clarke v. Travelers Ins. Co., 984 F.Supp. 49 (D.Mass.1997), a clearly frustrated court inveighed:
Under traditional notions of justice, the harms alleged - if true - should entitle [plaintiff] to some legal remedy *460 on behalf of herself and her children against Travelers and Greenspring. Consider just one of her claims - breach of contract. This cause of action - that contractual promises can be enforced in the courts - pre-dates Magna Carta. It is the very bedrock of our notion of individual autonomy and property rights. It was among the first precepts of the common law to be recognized in the courts of the Commonwealth and has been zealously guarded by the state judiciary from that day to this. Our entire capitalist structure depends on it.
Nevertheless, this Court had no choice but to pluck [plaintiffs] case out of the state court in which she sought redress (and where relief to other litigants is available) and then, at the behest of Travelers and Greenspring, to slam the courthouse doors in her face and leave her without any remedy.
Id. at 52-53.
It is no exaggeration to say that the federal courts have struggled mightily to maintain fidelity to ERISA’s expansive “relates to” preemption clause while avoiding the wholesale foreclosure of participants’ causes of action against their HMOs. But our search for a middle ground has proved to be a judicial snipe hunt, and we are no closer to success today than we were a decade ago. This Court’s own decisions illustrate the quagmire in which courts find themselves. In Dukes v. U.S. Healthcare, 57 F.3d 350 (3d Cir.1995), a participant sued his HMO alleging medical malpractice, a state-law tort, and the HMO argued that the claim was preempted by ERISA. We held that the claim was not preempted, reasoning that ERISA draws a distinction between actions challenging the quality of care provided and those claiming that the HMO provided an inadequate quantity of benefits under its plan. As we explained, actions challenging the quantity of benefits received are actions that could be brought under ERISA § 502(a)(1)(B) to “recover benefits due ... under the terms of the plan,” and any state law duplicating that remedy is preempted by ERISA § 514(a). Regulation of quality of care, conversely, was found to be “a field traditionally occupied by state regulation,” id. at 357, and we did not find “anything in the legislative history, structure, or purpose of ERISA suggesting] that Congress viewed § 502(a)(1)(B) as creating a remedy for a participant injured by medical malpractice.” Id.
We further explicated this quantity-quality distinction in In re U.S. Healthcare, 193 F.3d 151 (3d Cir.1999), which concerned, inter alia, a plan participant’s claim that her HMO was negligent in adopting a policy of presumptively discharging newborn infants within 24 hours. We “recognize[d] that the distinction between the quantity of benefits due under a welfare plan and the quality of those benefits will not always be clear,” id. at 162, and explained that the line-drawing difficulty arises in part “because the same HMO may have assumed both the role as a plan administrator and the separate role as a provider of medical services.” Id. The policy of discharging newborns after 24 hours was, however, determined to be a function of the “role as provider of medical services” because it was an “essentially medical determination of the appropriate level of care ..., not a claim that a certain benefit was requested and denied.” Id. at 162-63. We therefore held that the plan participant’s claim “fit[] squarely within the class of claims that we identified in Dukes as involving the quality of care” and was not preempted. Id. at 163.
Finally, in our most recent and important ERISA preemption decision, Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d *461 266 (3d Cir.2001), harm was allegedly caused by an HMO’s delay in approving a procedure to be performed by off-network physicians. There was no question whether the treatment itself was covered - the issue was merely one of eligibility, namely whether an off-network physician could perform the procedure. We took note of the Supreme Court’s recent decision in Pegram v. Herdrich, 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), where the Court distinguished between an HMO’s eligibility decisions and treatment decisions. Although Pegram directly concerned fiduciary duty rather than preemption, we held that its eligibility-treatment dichotomy was equally applicable in the preemption context; indeed, we considered it another way of viewing the quantity-quality distinction. We concluded that an eligibility decision is an administrative decision, and that any state-law action challenging it is preempted because a participant could instead bring suit under ERISA § 502(a)(1)(B) “to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his right to future benefits under the terms of the plan.” Conversely, a treatment decision is a medical decision that requires no interpretation of the plan itself, and it is not preempted by ERISA since § 502(a)(1)(B) offers a plaintiff no avenue of relief.
B.
I believe that Dukes, In re U.S. Healthcare, and Pryzbowski were all rightly decided, and that our opinion today reaches the correct conclusion based on those precedents. I write separately, however, to make clear my concern that the opinion masks extraordinary subtleties and complexities of this area of the law that cry out for clarification by the Congress, or, failing that, by the Supreme Court. In fact, I believe that the fundamental distinction upon which federal caselaw currently relies - between quantity and quality decisions, or between eligibility and treatment decisions - is untenable, and that the blurring is becoming more severe, not less. To the extent we insist on categorizing every HMO decision as either an eligibility or a treatment decision, we contort ourselves into parsing terms that are conceptually indistinguishable, and we fail to come to terms with the realities of modern health coverage.
This problem is evident even among relatively “easy” cases. Pryzbowski is perhaps one of the clearest-cut examples of an eligibility decision, for the HMO’s only action was designing its plan to utilize network doctors, a clear matter of plan administration. Conversely, when one thinks of “treatment” or “medical” decisions, one envisions a physician and an examination table, a world seemingly far removed from the HMO’s administrative offices. Yet even in Pryzbowski, it takes little creativity to recast the “administrative” matter of plan design as a “treatment” or “medical” decision, for the HMO implicitly determined that requiring plan participants to see network physicians would not expose them to any undue health risks. It is impossible to characterize that decision as anything other than partially medical, for it directly affected participants’ health. Indeed, the delay occasioned by the HMO’s so-called “administrative decision” quite literally caused Ms. Pryzbowski’s condition seriously to worsen.
The Supreme Court itself recognized this false dichotomy problem in Pegram, where it observed that many (and possibly most) HMO decisions contain elements of both eligibility and treatment considerations:
[A] great many and possibly most coverage questions are not simple yes-or-no *462 questions, like whether appendicitis is a covered condition (when there is no dispute that a patient has appendicitis), or whether acupuncture is a covered procedure for pain relief (when the claim of pain is unchallenged). The more common coverage question is a when-and-how question. Although coverage for many conditions will be clear and various treatment options will be indisputably compensable, physicians still must decide what to do in particular cases. The issue may be, say, whether one treatment option is so superior to another under the circumstances, and needed so promptly, that a decision to proceed with it would meet the medical necessity requirement.... In practical terms, these eligibility decisions cannot be untangled from physicians’ judgments about reasonable medical treatment.
530 U.S. at 228-29, 120 S.Ct. 2143.
Some courts have attempted to explain away the evident problems in the “eligibility versus treatment” dichotomy by holding that only HMOs which employ their own physicians can make medical decisions. See, e.g., Rubin-Schneiderman v. Merit Behavioral Care Corp., 163 F.Supp.2d 227 (S.D.N.Y.2001). Such courts suggest that HMOs which do not directly employ physicians cannot engage in “mixed” decisions because they do not actually treat patients. The Supreme Court itself has cast doubt upon this explanation, stating that decisions are considered “mixed” “not merely because ... treatment and eligibility are made by the same person, the treating physician.” Pegram, 530 U.S. at 228, 120 S.Ct. 2143. But this distinction is logically tenuous even absent that precedent, for an HMO that employs no physicians must nevertheless review the independent physicians’ recommendations to determine whether they comport with the health plan’s requirements.
The case at bar makes evident the impossibility that any such simple rule can adequately reflect the Byzantine complexities of modern-day health care. AETNA’S policy explicitly equated its coverage (i.e., eligibility) on an assessment of medical necessity. But the medical necessity clause, which attempts to convert medical decisions into eligibility decisions, compounds the problem I address herein. Indeed, Aetna denied coverage even though Dr. Picarieflo insisted the specialized tra-cheostomy tube was critical to DiFelice’s health. Tracheotomy is an extremely serious procedure, and the tracheostomy tube, whose uses are described in the margin, is an integral part of the procedure.[2] As two prominent medical school professors explain, tracheotomy “is associated with multiple and potentially life-threatening complications even under elective conditions.” Eugene N. Myers and Ricardo L. Carrau, Early Complications of Tracheotomy: Incidence and Management, 12 Clinics in Chest Medicine No. 3 at 589 (September 1991). Indeed, “[e]ven with the use of optimal surgical techniques, complications of tracheotomy may occur during the procedure, in the immediate postoperative period, or long after the surgery.” Eugene N. Myers and Sylvan E. Stool, Complications of Tracheotomy, Tracheotomy 147 (Churchill Livingstone 1985). They counsel that “[t]he best means of preventing complications whenever they occur [ ] are paying meticulous attention to detail in the performance of the surgery and perform *463 ing the tracheotomy as soon as it becomes obvious that the procedure is necessary.” Id.
This assessment is borne out by the history of DiFelice’s condition. In March of 2001, DiFelice was diagnosed with sleep and upper airway obstruction. His otolar-yngologist, Dr. Michael Picariello, attempted several unsuccessful treatments before determining that DiFelice needed a tra-cheostomy tube. Dr. Picariello surgically placed a tracheostomy tube in July of 2001, but it continually extubated from DiFel-ice’s neck. It was only then that Dr. Picariello determined that DiFelice needed a specially-designed tube to remedy a potentially life-threatening condition.
Aetna, however, overruled Dr. Picariel-lo’s expert medical judgment and determined that the tube was in fact not medically necessary, leaving DiFelice with the option of bringing an injunctive suit under ERISA § 502, paying out-of-pocket for the specially-designed tube, or receiving a second standard-shaped tube that Aetna agreed to cover. He opted for the covered tube, but after it was placed, he developed a serious and progressive soft tissue and bone infection that caused him to be admitted to Chester County hospital in October of 2001, following which he was referred to the Hospital at the University of Pennsylvania. There, doctors removed “significant portions” of his bone and tissue to treat the infection, and his pectoral muscle was surgically reconfigured.
Aetna claims that its decision was not medical merely because it was made with an eye to plan language. To me this makes no sense, for Aetna made precisely the same individualized determination of medical necessity as Dr. Picariello. The fact that Aetna is an HMO and Dr. Picar-iello is an independent physician is entirely irrelevant to the fundamental character of their assessments. My conclusion that Aetna’s decision may have been largely medical suggests that perhaps DiFelice’s claim should not be preempted. Such a result would follow comfortably under Dukes and In re U.S. Healthcare. I agree with Judge Rendell, however, that Supreme Court precedent compels the conclusion that the proper test is whether a suit is theoretically possible under § 502(a), an approach which leads to preemption under the facts of this case.
Judge Rendell’s opinion recognizes that Aetna’s decision had a medical component. It declines to characterize it as either eligibility or treatment, and concludes that in such mixed situations, preemption turns on the availability relief under ERISA § 502(a). This resolution at least has the salutary effect of creating a bright-line rule, perhaps the best we can hope for absent intervention from a higher authority that would enable a truly principled jurisprudence. But while this rule is relatively easy to apply, that ease comes at the direct expense of plan participants’ welfare. The rule’s premise is that HMOs that do not employ their own physicians are solely in the insurance business, that is, they do not provide care and cannot be medically negligent. In the opinion’s words, “because there is no allegation that Aetna actually provided the medical care, Aetna’s use of medical judgment could only have led to an eligibility, not a treatment, decision.” I believe that this statement (with which I do not agree) encapsulates precisely why ERISA’s failure to change with the times has rendered it incapable of protecting employees, and why Congress must act to prevent further injustice.
C.
As discussed above, existing Supreme Court precedent holds that ERISA disallows extracontractual damages even in in *464 stances of bad faith, an interpretation that gives safe harbor to HMOs that deny claims while also destroying any possibility of participants bringing § 502 actions under contingency fee arrangements. The result is that, in many cases, participants must take HMOs’ decisions as law - for example, when Aetna’s utilization review board denied coverage for DiFelice’s specialized tracheostomy tube, he faced the decision whether to pay for the specialized tube out-of-pocket, whereas appealing the HMO’s decision was simply impractical in the face of a medical emergency. In such cases, the critical insight is that the HMO de facto determines a patient’s actual treatment along with his eligibility for benefits, for it will be a relatively rare person who is able to pay for invasive procedures out-of-pocket.
Because ERISA creates a system in which an HMO’s benefit determination frequently determines the actual treatment a participant receives, it follows directly that HMOs determine quality of care - and make treatment decisions - regardless of whether they actually employ physicians. Put differently, the root of courts’ ERISA preemption nightmare is that ERISA forces them to distinguish between eligibility and treatment decisions while providing a remedial structure that makes the two virtually synonymous. For participants, the torment is still greater: ERISA de facto places the HMO in control of the treatment a participant receives, yet it preempts any state-law medical malpractice claim against that HMO and provides that the participant can recover no compensatory, punitive, or wrongful-death damages regardless of its malfeasance.
This situation has arisen because ERISA has failed to evolve to accommodate the rise of HMOs, which did not even exist when ERISA was enacted in 1974. Back then, fee-for-service insurers dominated the health care industry. See Pegram, 530 U.S. at 218, 120 S.Ct. 2143; see also Kent G. Rutter, Democratizing HMO Regulation to Enforce the “Rule of Rescue”, 30 U Mich. J.L. Ref. 147, 171 (1996). Insurers had little role in a person’s treatment decisions; instead, a participant would visit a doctor or hospital, receive treatment, and the doctor or hospital would bill the insurer. If an insurer refused to pay, the participant could bring suit under ERISA § 502(a) to recover benefits due under the terms of the plan. This was the role Congress envisioned for § 502, and it worked well, for any disagreement with an insurer would occur only after the participant’s medical crisis had abated, and in some ways the system created an incentive to provide too much care rather than too little.
Times have changed. Today, approximately 75% of insured American workers receive their health care through some type of “managed care” plan, a designation which includes HMOs. See Andy Miller, Managed Care Savings Noted, Atlanta J. & Const., June 5, 1997, at E3. One hallmark of managed care systems is the utilization review board, which approves or denies coverage for a procedure before the procedure actually takes place. Although a participant may appeal a utilization review board’s decision, the prior-approval system is thought to reduce costs to HMOs because participants are likely to choose an inferior (but approved) procedure over a superior procedure for which they might ultimately pay out-of-pocket following an unsuccessful appeal. ERISA is often ill-equipped to deal with the phenomenon of the utilization review board, for the lack of remedies available under § 502, as discussed above, actively encourages HMOs to deny claims. Because these denials now take place before the treatment itself, the effect is a systematic deterioration in the quality of treatment *465 participants receive, all oxymoronically occasioned by a statute “designed to promote the interests of employees and their beneficiaries in employee benefit plans.” Shaw, 463 U.S. at 90, 103 S.Ct. 2890.
III.
What is to be done? Not much, absent intervention by Congress or the Supreme Court, for lower courts are bound to follow precedents that lead inexorably to the “availability of § 502 relief’ preemption test set forth by the majority opinion in this case. However, several promising avenues exist. One is suggested by the Bipartisan Consensus Managed Care Improvement Act of 1999, H.R. 2723, 106th Cong., 1st Sess. (1999), which passed the House but was watered down in the Senate. See Langbein & Wolk, Pension and Employee Benefit Law at 561-62. That Act would have amended ERISA § 514 by adding a new subsection (e) providing that ERISA shall not:
be construed to invalidate, impair, or supercede any cause of action brought by a participant or beneficiary (or the estate of a participant or beneficiary) under State law to recover damages resulting from personal injury or for wrong death against any person -
(i) in connection with the provision of insurance, administrative services, or medical services by such person to or for a group health [plan], or
(ii) that arises out of the arrangement by such person for the provision of such insurance, administrative services, or medical services by other persons.
The Act would have disallowed punitive damages when the cause of action relates to an “externally appealable decision.” It set up such external appeal procedures for denials of benefit claims based on decisions that “the item or service is not medically necessary or appropriate or is investiga-tional or experimental” or “in which the decision as to whether a benefit is covered involves a medical judgment.”
Put more concretely, had the Act become law, Aetna would now face possible compensatory damages but not punitive damages, and its determination of medical necessity would be externally appealable. Although the Act passed the House, it did not survive in the Senate, which passed a version of health care reform containing no right to sue. See H.R. 2990, 106th Cong., 1st Sess. (1999). As suggested, the legislation approved by the House is one approach. There are doubtless others.
Even if Congress refuses to act, however, the Supreme Court, in its interpretive capacity, is capable of effecting salutary change in many ways. The Court has no crystal ball, and twenty years ago it could not have foreseen the radical changes that have overtaken the health care system, and the difficulties that its preemption decisions would create. The time might be right to reconsider the string of holdings, epitomized by Russell and Mertens, that rule out the possibility of recovering compensatory damages under ERISA § 503(a)(3). See generally John H. Lang-bein, What ERISA Means by “Equitable”: The Supreme Court’s Trail of Error in Russell, Mertens, and Great-West, Yale Law School Center for Law, Economics, and Public Policy, Research Paper No. 269, available online at www.ssm.com. Professor Langbein persuasively argues: (1) that the Supreme Court erred in interpreting ERISA’s language providing for “other appropriate equitable relief’ to mean only relief that was traditionally available in courts of equity; and (2) that the better view is that Congress intended “to remedy ERISA wrongs of the sort commonly remedied under trust law,” and a core principal of trust law, the “make- *466 whole standard,” attempts to “restore[] the victim to the position that he or she would have had had there been no breach of trust.”
That is precisely what compensatory damages do, and there is no reason to suspect that Congress intended to base ERISA on the law of trusts while omitting the predicate law’s core remedy. I note that I am not alone among federal judges in urging the Supreme Court to reconsider what has become a significant barrier to justice and the realization of Congressional intent. See, e.g., Cicio v. Does, 321 F.3d 83, 107 (2d Cir.2003) (Calabresi, J., dissenting) (“[I]t is not too late for the Supreme Court to retrace its Trail of Error and start over from the beginning, or for Congress to wipe the slate clean.”). Cf. Corcoran v. United Healthcare, 965 F.2d 1321, 1336 (5th Cir.1992) (“The characterization of equitable relief as encompassing damages necessary to make the plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation.”).
Another possibility for the Supreme Court, especially given its recent trend toward looking beyond the text of § 514(a) to determine ERISA’s preemptive scope, is to reexamine Congress’s intent (or lack thereof) with respect to preempting welfare benefit plans. Many scholars have noted that Congress did not carefully consider the scope of preemption when it drafted ERISA. See, e.g., Fick, The Last Article about the Language of ERISA Preemption?, 33 Harv. J. on Legis. 35, 53 (1996). The House bill would have preempted state laws that “relate to the reporting and disclosure responsibilities and fiduciary responsibilities of persons acting on behalf of’ ERISA-covered plans, and state laws that “relate to” funding and benefits-vesting provisions of pension plans. H.R. 2, 93d Cong., 1st Sess. (1973), 120 Cong. Rec. 4742 (1974). The Senate version, on the other hand, would have preempted state laws that “relate to the subject matters regulated by this Act.” S. 4200, 93d Cong., 1st Sess. (1973), 120 Cong. Rec. 5002 (1974).
In the final joint conference, the Committee adopted the present language, but made it available to the full Congress only ten days before the bill was enacted, and said little about the change. See Metropolitan Life Ins. Co., 471 U.S. at 745 n. 23, 105 S.Ct. 2380. There is scant reason to believe that the resulting language' was fully considered by the entire deliberative body; indeed, those who paid attention to the issue opined that § 514(a) was provisional. Section 3022 mandated the creation of a Joint Pension Task Force to study the practical effect and desirability of preemption, and Senator Jacob Javits, a sponsor of the legislation, said that “the desirability of further regulation - at either the State or Federal level - undoubtedly warrants further attention.” 120 Cong. Rec. 29,942 (1974) (remarks of Sen. Javits). Unfortunately, the Task Force never came into existence, and no further regulation was forthcoming.
The evidence suggests that Congress did not carefully consider whether the scope of preemption should reflect the different degrees of federal regulation of pension plans and welfare benefit plans. See Fisk, The Last Article about the Language of ERISA Preemption?, 33 Harv. J. on Legis. at 56. In my view, section 514(a)’s broad preemptive scope is sensible with regard to pension plans, for federal law fully displaces state law and provides vesting, requirements, minimum funding requirements, and a raft of other employee safeguards. However, to me, it makes much less sense with respect to welfare plans. As discussed supra, Congress ex *467 empted welfare benefit plans from most of ERISA’s substantive regulations, such as its vesting and minimum funding requirements.
As I see it, it is unlikely that Congress intentionally created this so-called, “regulatory vacuum,” in which it displaced state-law regulation of welfare benefit plans while providing no federal substitute. The more likely explanation is that Congress merely intended to create minimum safeguards to protect the financial integrity of welfare benefit plans while stopping short of federalizing the entire remedial regime, especially in light of what was a workable state-law remedial system. Congress’s failure to distinguish explicitly between pension and welfare benefit plans in § 514(a) is understandable, for, as explained above, the managed care plans that wreak havoc with § 514(a) as it relates to welfare benefit plans did not exist when ERISA was enacted. There is no evidence that Congress envisioned the current situation.
Taking note of Congress’s understandable lack of clairvoyance, the Supreme Court might embrace pragmatism and limit § 514(a)’s preemptive scope regarding welfare benefit plans. Although the distinction would find little support in the text of ERISA itself, Justices Scalia and Ginsburg recently admitted in a concurrence that:
[A]pplying the ‘relate to’ provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else. The statutory text provides an illusory test, unless the Court is willing to decree a degree of pre-emption that no sensible person could have intended - which it is not.
California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc., 519 U.S. at 335-36, 117 S.Ct. 832 (1997) (internal citation omitted). Absent textual guidance or meaningful legislative history, there is little to prevent a pragmatic solution to a problem Congress has not confronted.
No doubt there are other possible solutions. The vital thing, however, is that either Congress or the Court act quickly, because the current situation is plainly untenable. Lower courts are routinely forced to dismiss entirely justified complaints by plan participants who have been grievously injured by HMOs and plan sponsors, all because of ERISA, the very purpose of which was to safeguard those very participants. Our dockets grow increasingly crowded with cases where participants offer myriad varieties of artful pleadings in their desperate attempts to circumvent ERISA’s procrustean reach, and our caselaw grows massively inconsistent due to the sheer complexities of the subject and lack of any meaningful guidance. There must be a better way.
The Clerk of Court is directed to send a copy of this opinion (with attention directed to the concurrence) to the Solicitor of the Department of Labor; the Chair, Ranking Member, Chief Majority Counsel, and Minority Counsel of the Senate Committee on Health, Education, Labor, and Pensions; and the Chair, Ranking Member, Chief Majority Counsel, and Minority Counsel of the House Committee on Education and the Workforce.

. A Serbonian bog is a mess from which there is no way of extricating oneself. E. Cobham Brewer, The Dictionary of Phrase and Fable 1121-22 (First Hypertext ed.). The Serbonian bog itself was between Egypt and Palestine. Strabo called it a lake, and said it was 200 stadia long, and 50 broad; Pliny made it 150 miles in length. Hume said that whole armies have been lost therein, as did Milton: "A gulf profound as that Serbonian bog, / Betwixt Damiata and Mount Cassius old, / Where armies whole have sunk.” Milton, Paradise Lost, ii. 592.

. The purposes of a tracheotomy tube are: (1) to provide secure continuation of the airway through the passage of the soft tissues of the neck; (2) to offer a possibility of artificial pressure ventilation if needed; and (3) to seal the trachea to prevent aspiration of material above the tube or in the hypopharynx. See Carl-Eric Lindholm, Choice of Tracheostomy Tube, Tracheotomy 125 (Churchill Livingstone 1985).